**JOHN CLAY & CO. LIVESTOCK COMMISSION**

v.

**CLEMENTS et al.**

No. 14809.

United States Court of Appeals, Fifth Circuit.

June 30, 1954.

Robert F. Snakard, Ft. Worth, Tex. (Stone, Agerton, Parker & Kerr, Ft. Worth, Tex., Myers & Snerly, Chicago, Ill., of counsel), for appellant.

Robert F. Cherry, Edinburg, Tex., Rankin, Kilgore & Cherry, Edinburg, Tex., for appellees.

Before STRUM and RIVES, Circuit Judges, and DAWKINS, District Judge.

RIVES, Circuit Judge.

Appellees, by separate actions, which were subsequently consolidated, sued to recover the value of 114 head of cattle allegedly converted by appellant, who sold the cattle as the property of one I. V. Moulder at the Union Stock Yards in San Antonio, Texas. The facts were largely stipulated and are clearly set forth in the district court's memorandum findings as follows:

"The Union Stockyards at San Antonio is a stock yard as defined by Title III of the Packers & Stockyards Act of 1921, 7 U.S.C.A. § 202, 42 Stat. 163. Defendant partnership is a marketing agency, (as defined in Section 201 of Title 7), buying and selling livestock at the Union Stockyards registered with and licensed by the Secretary of Agriculture under the act.

"Moulder had been attending auction sales and buying cattle for nearly two years prior to the occasions involved in these actions. During that time he had bought cattle on 21 separate occasions from plaintiff, Community Sales Yard at Pharr, Texas, paying for them by giving drafts totaling $115,386.20, drawn on W. Y. Giesler at the Zavala County Bank of Crystal City, Texas, all of which had been honored and paid upon presentation. Plaintiff Clements, a rancher who had been raising and selling cattle for 25 years, had met Moulder and knew him favorably during that time but had no business dealings with him until the occasion involved herein.

"On Saturday afternoon, February 23, 1952, Moulder attended an auction sale at the Community Sales Yard at Pharr, Texas, and bought 66 head, giving in payment, (as he customarily did), a draft for $9,317.79, drawn on Giesler at the Zavala Bank. Community Sales Yard delivered him four invoices, on printed forms, containing a description of the cattle, the weight, the price per pound and the total price. In addition each invoice contained the following printed on the face:

" 'Customers purchasing and paying for live stock through this company by check or draft, expressly agree that title does not pass to said purchaser, but is retained by owner until the fund is actually received on the check or draft. Such check or draft is accepted only subject to the rules and practices of any bank in which it may be deposited for collection, and is accepted for collection only as an accommodation to the maker and does not constitute a payment for animals purchased until remittance received thereon.

(a hand pointing to) The property purchased on conditions stated above.'

"Without dispute, the foregoing printed condition is in keeping with and fully expresses a well known understanding and custom in the business of buying and selling cattle in Texas. Defendants presented no evidence that they were not familiar with this custom.

"Plaintiff Clements was seated by Moulder at the auction ring when the 66 head of cattle were bought by him. Upon Moulder's expressing a desire to buy more cattle, Clements told him he had some cattle at his ranch. After some conversation the two went to the pasture where Moulder bought 48 head for which he gave Clements a draft for $8,445, drawn on Giesler at the Zavala Bank. Clements did not execute a bill of sale or invoice for the cattle but would have done so if Moulder had requested it. He was, however, familiar with the custom of the trade set out above—(if check or

draft not paid, no title)—and contracted in his own mind with reference to it.

"The cattle remained in Clements' pasture until Sunday afternoon. At the time the cattle were purchased, Moulder had told plaintiffs that the cattle would be taken to Crystal City (Giesler's address), but on Sunday he stated they would be taken to Union Stockyards in San Antonio. Accordingly, on Sunday afternoon the entire 116 head were loaded, under Moulder's instructions, into trucks belonging to B. Goodwin with whom Moulder had contracted for trucking the cattle.

"Goodwin was a part-time employee of plaintiff, Community Sales Yard, but conducted an independent trucking business on the side. Purchasers at Community Sales Yard were free to make arrangements for the transportation of their cattle from the Yards with whomever they desired and about 50% of them used Goodwin's trucks. Ordinarily, Goodwin, at the time of loading, would give his drivers a printed form headed 'Marvin Goodwin, Edinburg, Texas,' (the name under which he conducted his trucking business), showing the name of the person or concern from whom the cattle were received (generally Community Sales Yards), the description of the cattle, 'to be transported to' a described place, 'and delivered to' a designated person or commission company. The form also carried a space for the signature of the shipper (purchaser) and of the consignee, when the cattle were delivered. On the occasion in question, however, for some unexplained reason, Goodwin did not fill out the regular form. Instead, according to the stipulation, he gave the trucker

'a written memorandum showing I. V. Moulder to be the owner of the cattle in the respective trucks for which the memorandum was issued and that each of said trucks were to haul the cattle to the Union Stock Yards at San Antonio to be consigned to the defendant.'

"The cattle were delivered by Goodwin's drivers to defendant on Sunday night, Februrary 24th, and Monday morning, February 25th, at which time defendant delivered receipts to the drivers. The cattle were then turned into the pens and sold by defendants, on February 25th, for the account of I. V. Moulder for $14,892.86. After deducting its commission, defendant paid to Moulder $14,641.11.

"Neither plaintiff made any effort to contact Giesler prior to the sale to ascertain if the drafts would be paid but each assumed that they would. Plaintiff, Community Sales Yard, deposited its draft for collection on Monday, February 25th. Later in the week it was returned unpaid and the Sales Yard instructed its bank to send it through again for collection. Whereupon it was returned again unpaid. Plaintiff Clements did not deposit his draft until February 29th, after which it was returned unpaid. In returning both drafts, the Zavala Bank noted on the back: 'Says return— says no authority to draw.[1]"

Appellant makes three specifications of error which we quote:

"1. The plaintiffs, by selling the livestock in question to Moulder, and by accepting Moulder's draft drawn on a third person for the purchase price thereof and delivering the livestock to Moulder with knowledge that said livestock were to be resold at San Antonio or

---

"[1]. While the evidence is hearsay, if objected to, it is clear that Moulder, who had been buying for Giesler, failed him in this instance, took the cattle to San Antonio, absconded with the money he received from defendant and disappeared."

elsewhere in the immediate future, waived any rights plaintiffs ever possessed to claim an interest or ownership in the livestock insofar as this defendant or any other innocent third party is concerned and by their acts and conduct evidenced an intent to pass title to Moulder insofar as the rights of this defendant are concerned on February 23, 1952, when the sale was made.

"2. The trial court erred in failing to hold that the case at bar presented a case where one of two innocent persons must suffer a loss by the act of a third person, that the one who placed the dishonest person in a position to perpetrate the fraud must bear the loss.

"3. The defendant received and sold the livestock, as was its duty as a market agency under the provisions of the Packers and Stockyards Act of 1921, as amended, and having acted as such market agency in good faith is not liable for conversion."

■ It would seem that, under Texas law, the sales were conditioned on payment of the drafts and did not pass title until the drafts were paid, unless there were waivers of that condition. Lang v. Rickmers, 70 Tex. 108, 7 S.W. 527, 529; Berlowitz v. Standley, 117 Tex. 362, 5 S.W.2d 963, 964; Johnson v. Robinson, 5 Cir., 203 F.2d 135, 136. Indeed, as to the first specification, appellant states in brief that it is not contended that as between the appellees and the wrongdoer, Moulder, the district

court's holding is erroneous, but rather that the district court ignored the principle stated in cases where the rights of third parties acting in good faith are involved. So understood, appellant's first and second specifications of error are closely akin.

■ We think, however, that the principle contended for by the appellant is not applicable here, because the appellees did not invest Moulder with all of the indicia of title and the appellant, as a reasonably prudent person, was charged with the duty of inquiring for such indicia. See 46 Am.Jur., Sales, § 465. By statute in Texas, a purchaser's possession of cattle without a bill of sale or written transfer is prima facie illegal.[1] Moulder had no bill of sale from Clements, and such writing as he had from the Community Sales Yard, if examined by appellant, would have given notice that title to the cattle did not pass until the money was received on the draft. There is no evidence that appellant ever asked Moulder for a bill of sale or other indicia of title or took the precaution of inquiring how he came into possession of the cattle.

The learned district judge aptly commented:

"The fact that Goodwin gave his drivers a memorandum ('a slip of paper' in his own words) 'showing I. V. Moulder to be owner of the cattle' is of no consequence. The memorandum did not purport to be the act of plaintiffs. It was not on their letterhead or even on Goodwin's. It would only bear on the

---

1. Article 6903, Vernon's Annotated Civil Statutes of Texas provides in part:
 "Upon the sale or transfer of any horse, mare, mule, gelding, colt, jack, jennet, cow, calf, ox, or beef steer by any person in this State, the actual delivery of such animals shall be accompanied by a written transfer to the purchaser from the vendor, or party selling, giving the number, marks and brands of each animal sold and delivered. Upon the trial of the right of property in any such animal, the possession of such animal without said written transfer shall be prima facie illegal * * *."
 See also Article 1482, Vernon's Annotated Penal Code of Texas, making it a misdemeanor to purchase "any animal or hides of cattle without obtaining a bill of sale from the owner or his agent".

good faith of defendant which plaintiffs have conceded in the stipulation and which, as shown by the authorities hereafter cited, is immaterial. Defendant does not even claim to have seen this 'slip of paper' or memorandum, or to have asked Moulder to exhibit his bill of sale."

 Appellant was not an innocent purchaser, but sold the cattle as Moulder's agent, and, while admittedly in good faith, it negligently assisted Moulder to succeed in his scheme to convert the cattle and escape with the proceeds of sale.

"As a general rule, a factor or commission merchant who receives property from his principal, sells it under the latter's instructions, and pays him the proceeds of the sale is guilty of a conversion if his principal had no title thereto or right to sell the property; and the factor may not escape liability to the true owner for the value of the property by claiming that he acted in good faith and in ignorance of his principal's want of title." 22 Am.Jur., Factors, § 48.

See also, 2 A.L.I., Restatement, Agency, § 349. That rule prevails in Texas. Alamo Live Stock Commission Co. v. Heimer, Tex.Civ.App., 192 S.W. 591; Walker v. Caviness, Tex.Civ.App., 256 S.W.2d 880.

██ As to appellant's third specification of error, we agree with the cases which have held that the Federal Packers and Stockyards Act does not absolve the factor or market agency from liability for conversion. Walker v. Caviness, supra; Birmingham v. Rice Bros., 238 Iowa 410, 26 N.W.2d 39, 2 A.L.R.2d 1108; Sig Ellingson & Co. v. DeVries, 8 Cir., 199 F.2d 677; Sig Ellingson & Co. v. Butenbach, 8 Cir., 199 F.2d 679; 50 Am.Jur.,(Supp.), Stockyards, Section 5; Annotation 2 A.L.R.2d 1124.

The judgment is, therefore, affirmed.