UNITED STATES of America

v.

Sandy SOMMERVILLE, trading and doing business under the name and style, New Wilmington Livestock Auction, Appellant.

No. 14325.

United States Court of Appeals Third Circuit.

Argued June 20, 1963.

Decided Nov. 14, 1963.

As Amended Jan. 8, 1964.

Loyal H. Gregg, Pittsburgh, Pa. (Gregg & Price, Pittsburgh, Pa., James A. Stranahan III, Stranahan & Stranahan, Mercer, Pa., on the brief), for appellant.

Alan S. Rosenthal, Dept. of Justice, Washington, D. C. (John W. Douglas, Asst. Atty. Gen., Gustave Diamond, U. S. Atty., Edward A. Groobert, Atty., Dept. of Justice, Washington, D. C., on the brief), for appellee.

Before BIGGS, Chief Judge, STALEY, Circuit Judge, and STEEL, District Judge.

BIGGS, Chief Judge.

This case sounds in tort and has been labeled a suit for conversion: i. e., an action for the wrongful taking of an interest in property. The United States, acting on behalf of Farmers Home Administration (FHA), is the plaintiff. The defendant is an auctioneer licensed under the laws of Pennsylvania and doing business in that Commonwealth. He was cast in the litigation and appeals. The relevant facts follow.

During the period March 1954 to March 1958, FHA made loans from time to time to Flickinger, a farmer of Mercer County, Pennsylvania. As security for these loans Flickinger executed security agreements in favor of FHA covering all his personal property, including his farm equipment, crops and livestock. On July 10, 1958 [1] Flickinger executed another security agreement covering the same prop-

---

1. In 1957 Flickinger had been in default on his FHA loans. In that year he sold cattle which were subject to an FHA security agreement. Upon learning of

erty as security for a loan to him of $4,161.14 by FHA. This security agreement stated that it was "intended by the parties to serve as both 'Financing Statement' and 'Security Agreement' under Pennsylvania Law." The agreement was recorded in Mercer County in accordance with the law of Pennsylvania on the day it was executed.

Between March 30, 1959 and sometime in April, 1959, Flickinger, without the knowledge or consent of FHA, delivered three cows covered by the agreement to the defendant for auction sale in the regular course of business.[2] The defendant had no actual knowledge of FHA's security interest in the livestock.[3] The purchase money, less the defendant's commission, was turned over to Flickinger after the sale.

In April of 1959 FHA learned that Flickinger had sold the three cows. The Agency, however, took no action, except to urge Flickinger to conduct a voluntary liquidation of all of his property. In November 1959 such a sale was held and the proceeds were turned over to FHA. After payment of the proceeds to the Agency, Flickinger was still indebted to FHA in the amount of $551.69. FHA did not inform the auctioneer, the defendant Sommerville, that the three cows that Flickinger had delivered for sale to and

were sold by Sommerville were covered by any security agreement.

The suit at bar was commenced on February 10, 1961. Sommerville then became aware for the first time of FHA's contentions and demands for payment.[4] An answer was filed and after various proceedings which need not be recited here, the case was tried to the court. The trial judge found Sommerville liable and entered judgment for the United States in the amount of $377.49.

The appeal presents the following issues: (1) whether the liability issue is governed by state or federal law; (2) whether the applicable law imposes liability on an auctioneer who sells livestock covered by an FHA security agreement without actual knowledge of that coverage; and (3) whether the United States by prior conduct waived its right to maintain the action against Sommerville. We will deal with these issues in the order presented.

(1) Whether Liability is Governed by State or Federal Law.

 Decisions of the Supreme Court,[5] this court[6] and other courts[7] demonstrate that federal law is applicable in the case at bar. An independent federal rule of decision must be applied when a genuine federal interest would be subjected to uncertainty by application

---

the default, FHA took no action, either criminal or civil against Flickinger. The 1958 agreement was made in spite of Flickinger's default and the sale by him of the cattle.

2. The defendant has a large, rapid scale operation. On Monday of each week, approximately thirteen hundred head of cattle are sold under his direction. The cattle are generally delivered on the day of sale and are classified and sold the same day.

3. This fact was stipulated. The findings indicate that Flickinger represented that he was the owner of the cows and that there were no liens or encumbrances against them.

4. Prior to the instant transaction Sommerville had paid three separate claims made by the United States for livestock subject to similar security agreements also sold at defendant's auctions.

5. Howard v. Lyons, 360 U.S. 593, 79 S.Ct. 1331, 3 L.Ed.2d 1454 (1959); United States v. Standard Oil Co., 332 U.S. 301, 67 S.Ct. 1604, 91 L.Ed. 2067 (1947); United States v. County of Allegheny, 322 U.S. 174, 64 S.Ct. 908, 88 L.Ed. 1209 (1944); Clearfield Trust Co. v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943).

6. American Houses, Inc. v. Schneider, 211 F.2d 881, 44 A.L.R.2d 1352 (3 Cir. 1954); Girard Trust Co. v. United States, 149 F.2d 872 (3 Cir. 1945).

7. United States v. Union Livestock Sales Co., 298 F.2d 755 (4 Cir. 1962); American Pipe & Steel Corp. v. Firestone Tire & Rubber Co., 292 F.2d 640 (9 Cir. 1961); United States v. Matthews, 244 F.2d 626 (9 Cir. 1957); O'Brien v. Western Union Tel. Co., 113 F.2d 539 (1 Cir. 1940); Byron Jackson Co. v. United States, 35 F.Supp. 665 (S.D.Cal.1940).

of disparate state rules.[8] No broad review of the decisions is necessary. Reference to the most pertinent will be sufficient. In Clearfield Trust Co. v. United States, 318 U.S. 363, 367, 63 S.Ct. 573, 575, 87 L.Ed. 838 (1943), the United States sued a bank which guaranteed all prior endorsements on a federal check issued to a WPA worker. The Supreme Court applied federal common law. It emphasized that "the application of state law * * * would subject the rights and duties of the United States to exceptional uncertainty. It would lead to great diversity in results by making identical transactions subject to the vagaries of the laws of the several states." A federal interest and a concomitant source of federal law were found to exist because "[t]he authority to issue the check had its origin in the Constitution and the statutes of the United States * * *." Id., supra, 318 U.S. at 366, 63 S.Ct. at 575, 87 L.Ed. 838.

Genuine federal interests have been found to be present when federal elements such as statutes, regulations and executive orders exist in the pertinent field.[9] The reasoning underlying the Clearfield decision has been used to support the appliction of federal law to suits in which there were federal interests regardless of whether the United States was or was not a party,[10] or whether diversity of citizenship or a federal question served as the jurisdictional basis for the action. This court has applied federal law to determine the rights of parties under a lease executed by the United States.[11]

The principles developed in contract cases were found to be applicable to tort actions in United States v. Standard Oil Co., 332 U.S. 301, 305, 67 S.Ct. 1604, 1607, 91 L.Ed. 2067 (1947). In the cited case the United States sued for loss of services and medical expenses incurred when a soldier was hospitalized by reason of the defendant's tortious conduct. The Supreme Court deemed federal law to be applicable. After discussing the principles of Clearfield, the Court said: "[T]hey are equally applicable in the facts of this case where the relations affected are noncontractual or tortious in character." A federal interest was found to exist in the relationship between the United States and the members of the armed services. The federal fisc was found to be affected and thus the United States' power to protect itself from financial injury added weight "to the military basis for excluding state intrusion." Id., supra, 332 U.S. at 306, 67 S.Ct. at 1607, 91 L.Ed. 2067. The Court concluded that "we know of no good reason [appears] why the Government's right to be indemnified * * * should vary * * * simply because the soldier marches or today perhaps as often flies across state lines." Id., supra, 332 U.S. at 310, 67 S.Ct. at 1609, 91 L.Ed. 2067.

In the case of Howard v. Lyons, 360 U.S. 593, 79 S.Ct. 1331, 3 L.Ed.2d 1454 (1959), the Supreme Court held that federal common law governs the privilege

---

8. Two separate inquiries must be made. The first is to ascertain if the requisite federal interest is present. If there is, a federal rule may be formulated. The necessity of uniformity must decide whether state law should be rejected as the source for the applicable federal rule.

9. For example, in Clearfield Trust Co. v. United States, supra, note 5, the Federal Emergency Relief Act, various treasury regulations controlling the payment of government checks, a criminal statutory provision making forgery a crime, and the constitutional power to require the payment of debts due the United States were present to show a federal interest. See generally, Note, "Clearfield: Clouded Field of Federal Common Law", 53 Colum.L.Rev. 991 (1953); Note, "Exceptions to Erie v. Tompkins: The Survival of Federal Common Law", 59 Harv. L.Rev. 966 (1946).

10. See American Pipe & Steel Corp. v. Firestone Tire & Rubber Co., supra, note 7, which held that federal common law governed a diversity action by a subcontractor against a government prime contractor. O'Brien v. Western Union Tel. Co., supra, note 7, applied federal law to a libel action.

11. See the decisions cited in note 6, supra.

afforded a naval officer in a diversity suit brought for defamation. It thus seems established, apparently beyond question, that the Clearfield doctrine applies in a tort-type case.

The loans to Flickinger and the acquisition by the FHA of a security interest in the cows were created under the authority of the Bankhead-Jones Farm Tenant Act, 65 Stat. 197. The Act authorized a large loan program designed to enable farmers and stockmen to become established successfully in a sound, well-balanced system of farming or stock raising and to make full and efficient use of their land and labor resources.[12] The security interest having been obtained under an Act of Congress pursuant to a grant of constitutional authority, it is clear that the requisite federal interest and source of federal law are present. But, we need not stop here since in the instant case, as in the Standard Oil decision, the power of the United States to protect its purse is operative. Potential financial injury to the United States is apparent. The duty to mold a federal rule is clear.[13]

In so stating we are not unmindful of the statement of the Supreme Court in Clearfield that "[i]n our choice of the applicable federal rule we have occasionally selected state law."[14] We conclude, however, that the interest of the United States in the administration of the loan program would be undermined and its power to protect its purse limited if disparate laws of individual states were applied to substantially identical loan transactions. Such transactions would be subjected to diverse legal effects.[15] The FHA would have to frame its loan program to suit the policies of particular states as evidenced by their respective laws. The United States, as a party-plaintiff would be able to protect itself from financial loss in one state but not in another. Protection of the purse is paramount here and is paramountly federal. Whether the United States can maintain a suit on an FHA loan must depend on uniform federal policies. Compare United States v. Shimer, 367 U.S. 374, 81 S.Ct. 1554, 6 L.Ed.2d 908 (1961).

It can be argued, of course, that because of the terms of the security agreement, viz., because of that phrase stating that it was "intended by the parties to serve as both 'Financing Statement' and 'Security Agreement' under the Pennsylvania law," and because the security agreement was recorded as provided by the law of Pennsylvania, the law of Pennsylvania and not the federal law must define the obligations of Flickinger as well as the liabilities of Sommerville to the FHA. It can be contended further that since the Uniform Commercial Code, 12A P.S. § 9–503 (Supp.1962), set out as a cumulative remedy in the security agreement, gave the FHA the right to immediate possession of the cows upon default

12. Operating loans to farmers are now covered by 7 U.S.C.A. § 1941 et seq. There is no difference between the old and the new provisions in regard to the issues raised by this appeal.

13. The appellant's basic argument against application of federal law is premised on the Rules of Decision Act. That Act provides: "The laws of the several states, except where the Constitution or treaties of the United States or Acts of Congress otherwise require or provide, shall be regarded as rules of decision in civil actions in the courts of the United States, in cases where they apply." 28 U.S.C. § 1652. The Clearfield doctrine was developed after the Rules of Decisions Act was passed. Therefore, the action of the Supreme Court may be considered an implied rejection of the appellant's argument. When there is a genuine federal interest, the Constitution or statutes of the United States can be said to "require" application of federal law. Indeed, the use of the words "require or provide" indicates that Congress thought that state law could be displaced by implication. This is so because the term "provide" means an express selection of federal law. "Require" was used in the disjunctive and therefore it seems logical to interpret it as allowing federal law to apply by necessary implication.

14. See Clearfield Trust Co. v. United States, supra, note 5, 318 U.S. at 367, 63 S.Ct. at 575, 87 L.Ed. 838.

15. The Court in Clearfield was concerned with this precise problem.

under Section 9 of the agreement and assertedly the right to maintain the action of conversion, Pennsylvania law must govern all of the rights and duties of the parties.

We find this argument unpersuasive. The fact of the recording of the security agreement as required by the Pennsylvania law under the terms of the security agreement is an incident in the perfecting of the lien of the FHA on the cows. To this extent we look to the law of Pennsylvania and no further. In respect to the other arguments set out in the preceding paragraph we are of the opinion that under the general federal law, discussed hereinafter, an individual who causes property in which another has a valid interest to be sold at auction without authorization and converts the proceeds to his own use, is guilty of the tort of conversion. The wronged individual becomes entitled to maintain his suit to recover damages when the property is taken. The genesis of the obligations, duties, and liabilities of the parties in this litigation lies in the Bankhead-Jones Farm Tenant Act, and absent express congressional declaration of intent that state law shall be applicable, we are reluctant to subject federal rights and duties to the exceptional uncertainty and heterogeneity [16] which may ensue in many cases. We will not do so.

We will now proceed to the second issue in the case mindful of "state rules and precedents only in so far as in professional judgment we may be persuaded that they are sound." [17]

(2) Whether Federal Law Imposes Liability on an Auctioneer When He Sells Without Knowledge of an Existing Recorded FHA Security Agreement.

■ Viewed as a matter of federal policy we conclude that allowing the United States to maintain the suit at bar against the auctioneer is necessary and salutary. Such a conclusion gives the FHA an additonal remedy which augments the integrity of its security interest. If the Agency was limited to suing the mortgagor the ease with which loans could be made would be greatly impaired. The auctioneer earned commissions from the sale of the cattle and had it in his power to protect himself against such losses as that which incurred in the instant case. Costs of insurance had he been insured could have been regained from profits. No similar means are available to the taxpayers who support the federal fisc, nor to the United States when it makes loans to further national interest.

Examination of the general law shows that the weight of authority favors the imposition of liability under circumstances such as those at bar. The federal law has not developed differently.[18]

16. Three other circuits have faced exactly the same question. The Ninth Circuit in United States v. Matthews, supra, note 7, held that the case was governed by the general federal law which should be fashioned without reference to state law. The Fourth Circuit, in United States v. Union Livestock Sales Co., supra, note 7, 298 F.2d at 759, held, in what we deem to be the gist of its decision, that in respect to the liability of a third person under circumstances substantially similar to those at bar: "[W]e think the circumstances justify the court in choosing the state law as the appropriate federal rule to be applied to the loan transaction. We find no need for uniformity in these transactions throughout the United States." The Eighth Circuit held state law controlled in United States v. Kramel, 234 F.2d 577 (1956).

17. We quote Judge Hastie's language in American Houses, Inc. v. Schneider, supra, note 6, 211 F.2d at 883.

18. See generally United States v. Union Livestock Sales Co., note 7, supra; United States v. Matthews, note 7, supra; John Clay & Co. Livestock Comm'n. v. Clements, 214 F.2d 803 (5 Cir. 1954); Prosser, Torts, 2d ed. 1955 § 15 at 71–73; Restatement (Second), Agency § 349 and the appendix to the section which includes numerous cases imposing liability; Restatement, Torts § 233 (Supp. 1948). Under the view that we have expressed we are not required to take particular note of the Uniform Commercial Code.

The auctioneer by selling the property interfered with and converted the FHA's right to the chattels and therefore must be held to be strictly accountable. Liability may also be imposed on the ground that the auctioneer as an agent of the mortgagor stands in the shoes of his principal.[19] This is a principle embodied in the general federal law of agency and is a corollary to the established agency principle that one is not excused from the consequences of his action because he acts at the behest of another.[20] This reasoning for holding the auctioneer accountable applies with equal force when the United States asserts its rights. Federal policy and prior precedent are in agreement. We think that the liability is clear.

(3) Whether the United States Waived Its Right to Sue for Conversion.

Sommerville contends that a secured person can waive his right to enforce his security interest. The facts relied upon to show waiver, briefly stated, are as follows. The FHA loaned money to Flickinger despite his previous defaults and sales of secured livestock. The United States refuses to supply auctioneers with lists of secured livestock or to allow the cows subject to its security agreements to be branded. The FHA did not give notice to the appellant that it was going to look to him for payment but merely filed the suit two years after the alleged conversion.

In so far as the appellant's arguments are premised on state law we deem them inapplicable. Federal law governs the security right of FHA. It must also control how the right can be waived. The problem here is the administration of a nationwide program by a federal agency in such a way as to render it flexible and efficient. Whether or not there was a waiver must be determined by the usual federal standard for the issue is a mixed one of law and fact.[21] The trial court stated, "I am unable to find from the evidence any intended waiver on the part of the government." The record fully substantiates this conclusion.[22] Refusal to supply lists or allow branding merely puts the onus of getting the information on the auctioneer. The security agreements were recorded. Waiver cannot be inferred. The bringing of the suit two years after the conversion does not constitute a waiver. To hold otherwise under the circumstances at bar would be to create an applicable statute of limitations by judicial fiat. The contention that the United States waived its right to bring and maintain the suit at bar is without merit.

The judgment will be affirmed.

STEEL, District Judge (concurring).

Federal jurisdiction in this case is not based upon diversity of citizenship, but upon 28 U.S.C. § 1345 authorizing the United States to sue in the District Court. Even so, the majority, it is believed, has mistakenly chosen federal common law as dispositive of defendant's liability. This was because of its failure to consider factors which persuasively indicate that state law should control, in this case the law of Pennsylvania where all of the operative facts occurred.

The action is based upon an alleged conversion by defendant by the sale at public auction of cattle against which plaintiff had a publicly recorded lien.

19. The appellant argues that an auctioneer is not an agent. An agent is a person authorized by another to act on his account and under his control. See Restatement (Second), Agency § 1, comment e, which uses an auctioneer as a common example of an agent. The appellant's argument is not sound.

20. See Restatement (Second), Agency § 349; Restatement, Torts § 233 (Supp. 1948).

21. See Hart & Wechsler, The Federal Courts and The Federal System, 1953, pp. 539–45.

22. It follows that the question of the proper scope of our review need not be decided. Cf. Surgical Supply Serv. v. Adler, 321 F.2d 536 (3 Cir. 1963). In the cited case the question was whether the clearly erroneous rule applied when the evidence was uncontradicted and the problem was what were the proper inferences to be drawn therefrom.

In order to maintain an action for conversion, a plaintiff is required to show that he is in possession, or entitled to possession, of a chattel at the time of the alleged wrong. Prosser On Torts (2d Ed.), § 15, p. 67. Although a person may be out of possession he can maintain an action if he is entitled to immediate possession. 1 Restatement Of The Law of Torts, Vol. I, 550 (1934). Unless a person is in possession or immediately entitled to possession an action for conversion cannot be maintained. 53 Am. Jur., "Trover & Conversion", § 68, p. 863.

Essentially, an action for conversion is bottomed upon a tortious interference with one's possessory right. Since plaintiff was not in possession of the cattle when they were sold, it is necessary to ascertain if plaintiff was then entitled to their immediate possession and if so, the genesis of the right.

The lien which the plaintiff had against the cattle arose out of a "security agreement" dated July 10, 1958, between plaintiff and the cattle owner, Flickinger. The agreement stated in the preamble that it was "intended by the parties to serve as both 'Financing Statement' and 'Security Agreement' under Pennsylvania law", and in paragraph 9 that in the event of default the plaintiff, in addition to other specified rights, could "proceed to exercise any rights accorded by the Uniform Commercial Code". One of the rights granted to a secured party by the Code was the right to take possession of the security on default. Pa.Stat.Ann. tit. 12A, § 9–503 (Supp.1962).

In paragraph 6 of the agreement, Flickinger covenanted not to sell or otherwise dispose of the cattle, or permit others to do so, without the prior written consent of the plaintiff. Paragraph 9 of the agreement provided that a violation of this covenant would constitute a default. Hence, when Flickinger's cattle were sold by the defendant, a default occurred.

Furthermore, the agreement stated in paragraph 14 that it was subject to the then existing regulations of the FHA and to future regulations not inconsistent with the express provisions of the agreement. Regulation § 371.21(c) then in effect, 6 CFR § 371.21(c) (Supp.1958), 13 Fed. Register, p. 9454 (1948), provided that an act of bad faith by the borrower in connection with his loan constituted a default. Obviously, Flickinger's delivery of the cattle to the auctioneer for sale was an act of bad faith and hence a default. Upon this occurrence, plaintiff became entitled under Pa. Stat.Ann. tit. 12A, § 9–503 (Supp.1962) to take possession of the cattle.[1] The alleged conversion is the defendant's interference by sale at auction with this possessory right.

In a broad sense, it might be said that the right of the Government to repossess the cattle had its source in the Bankhead-Jones Farm Tenant Act of 1937, 7 U.S.C. §§ 1001–1005(d), 1007, 1008–1029 (1952), for without the Act the loan would not have been made. But more immediately, the right of repossession stemmed from the Uniform Commercial Code of Pennsylvania, which the parties expressly agreed should be the basis of the Government's rights in the event of Flickinger's default.

It was not necessary for the Government to incorporate the Pennsylvania Code into the agreement in order to reserve possessory rights. It could have expressly spelled out such rights in the agreement without reference to state law,

---

1. The general rule appears to be that the right of possession necessary to the maintenance of an action for conversion may arise from the act relied upon as constituting the conversion itself. 53 Am.Jur., "Trover & Conversion", § 67, p. 862. Thus, when a mortgage provides that the mortgagee may repossess a chattel upon its sale or removal, the sale itself gives the mortgagee such a possessory right as entitles him to sue for conversion. 10 Am.Jur. Chattel Mortgages § 178, p. 834. See also Morin v. Hood, 96 N.H. 485, 79 A.2d 4 (1951). It is unnecessary to inquire whether this principle is applicable, for a default existed prior to the sale by virtue of defendant's bad faith in authorizing the sale and delivering the cattle for that purpose.

as it appears to have done in the agreement before the Court in United States v. Matthews, 244 F.2d 626, 628 (9th Cir. 1957). Since the possessory right which the Government seeks to protect was created by Pennsylvania law, it is reasonable to apply Pennsylvania law in determining the consequence of defendant's interference with that right.

The opinion of the majority that federal common law is controlling is based primarily upon Clearfield Trust Company v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943), United States v. Standard Oil Company of California, 332 U.S. 301, 67 S.Ct. 1604, 91 L.Ed. 2067 (1947), and Howard v. Lyons, 360 U.S. 593, 79 S.Ct. 1331, 3 L.Ed.2d 1454 (1959). In Clearfield, the Court held federal common law to be applicable in determining the liability of an endorser of a Government check who had guaranteed all prior endorsements in accordance with the requirement of the Treasury Regulations. The Court took pains to note that the authority to issue the check was "in no way dependent on the laws of Pennsylvania or of any other state." 318 U.S. at 366, 63 S.Ct. at 575, 87 L.Ed. 838. Quoting this language and stating that Clearfield governed, the Court in the Standard Oil Company case, 332 U.S. at 305, 67 S.Ct. at 1606–1607, 91 L.Ed. 2067, held that federal law determined whether the Government could collect from one who had negligently injured a U. S. soldier, amounts expended by the Government for the hospitalization and pay of the soldier during his incapacitation. In the Howard case the Court held that federal law determined whether statements defamatory under state law were privileged when made by an officer of the Federal Government acting in the course of his duty.

In Clearfield and Standard Oil, the right sought to be asserted, and in Howard, the right sought to be protected, had their geneses solely in federal relationships. In the case before us, the possessory right allegedly infringed was rooted in Pennsylvania law. This, in my view, critically distinguishes this case from the Supreme Court's decisions relied upon by the majority.

United States v. Matthews, 244 F.2d 626 (9th Cir. 1957), held that federal law should control the auctioneer's liability for selling cattle in which the Government held a lien to secure a loan under the Bankhead-Jones Farm Tenant Act. The decision, however, was based upon Clearfield, a contractual right to repossess having no relationship to state law was involved, and the parties agreed in the litigation that federal law applied. For these reasons, Matthews is not persuasive as precedent. Other courts have reached a contrary conclusion and applied state law, United States v. Kramel, 234 F.2d 577 (8th Cir. 1956); United States v. Union Livestock Sales Company, 298 F.2d 755 (4th Cir. 1962). Albeit the latter case held that federal law was controlling, it determined federal law by reference to state law.[2]

There is nothing in the Bankhead-Jones Farm Tenant Act which in terms requires us to apply federal common law. Its implications are to the contrary. It authorizes the Secretary of Agriculture, except as otherwise specifically provided by Congress, to make a loan such as we have before us "upon such security and such other terms and conditions as the Secretary may prescribe * * *." 7 U.S.C. § 1018 (b) (1952). It was pursuant to this broad Congressional authorization, and in the absence of legislative limitation, that the security agreement granted the Government the rights stated in the Uniform Commercial Code of Pennsylvania. This choice of local law had tacit Congressional approval, and we should not disturb it. Compare United States

2. United States v. Ferguson, 158 F.Supp. 814 (E.D., Ark., W.D., 1958), followed Kramel and applied state law. United States v. Sig Ellingson & Co., 164 F. Supp. 7 (D.Mont, Billings Div., 1958) followed Matthews and applied federal law. United States v. Covington Independent Tobacco Warehouse Company, 152 F.Supp. 612 (E.D., Ky., Covington Div., 1957) assumed, without discussion that state law was dispositive of the auctioneer's liability.

v. Shimer, 367 U.S. 374, 382–383, 81 S.Ct. 1554, 6 L.Ed.2d 908 (1960).

Furthermore, the regulations which the Secretary promulgated under authority of § 1015(i) of the Act, 7 U.S.C. § 1015(i) (1952), disclose that state law rather than federal common law is pertinent not only to the relationship between the Government and borrowers but also to the rights of third parties. Thus, 6 CFR, § 341.8 (Supp.1958) authorizes loans for the purchase of bulk milk tanks and pipe line milkers only if they can be made "subject to a chattel lien under state law". 6 CFR § 342.3(g) (Supp.1958) dealing with the form of the promissory note which a borrower must give states "[t]he applicant's spouse will be required to execute Form FHA–31 when legally required by state law * * * or it is determined by the state director on a state basis that the spouse's signature will be required." 6 CFR § 341.10(6) (c) (Supp. 1958) empowers a FHA state director to require "on a state or other basis, because of state statutes or types of leases, land purchase contracts, and real estate mortgages, that * * * the holders of such instruments subordinate their interests in whole or in part so that the Government can obtain the required security". 6 CFR § 371.32(a) (2) (Supp. 1958) provides that when the Government sells collateral under a power of sale, it shall pay, subject to certain exceptions not presently important, "liens which under state law are prior to those of the Farmers Home Administration, in accordance with their state law priorities, * * *."

Consistent with the significance attributed to state law by the regulations, in administering the Act the executive personnel of the FHA have recognized that the civil liability of an auctioneer who disposes of property in which the Government has a security interest is to be determined by state law. Thus, in a letter dated July 29, 1958, which K. L. Scott, the Director of Agricultural Services, wrote to Congressman Kirwin, apparently in connection with certain suggestions which had been made to him by a live-stock auctioneer of Pennsylvania, Mr. Scott said:

> " * * * the agency takes its chattel security on instruments meeting the requirements of State law, and files such liens as provided by State law, to afford statutory notice to persons dealing with the security property. Thus, the Government, as mortgagee, does the same thing that any private mortgagee would do to secure his loan on cattle and, of course, is accorded the same legal rights."

Thereafter, Director Scott stated the policy of the FHA to be as follows:

> "It is the policy of the Farmers Home Administration to take all possible steps for the recovery of the debt from the borrower before seeking to enforce any liability of third parties who may, by their purchase, sale, or other dealing with mortgaged property, have incurred a civil liability under the State laws to the United States as mortgagee."

Similarly, on June 3, 1959, K. H. Hansen, the Administrator of the Farmers Home Administration, wrote to one Hertzler, an attorney who apparenly had suggested an amendment to the Bankhead-Jones Farm Tenant Act which would relieve or minimize the liability of livestock auctioneers, saying:

> " * * * we would not favor an amendment to the Bankhead-Jones Farm Tenant Act or our other lending authorities which would have the effect of relieving livestock auction markets from any liability in dealing with mortgaged property which is imposed on them under State law."

These statements disclose that those charged with administering the Act believed that the civil liability of an auctioneer arising out of an unauthorized sale of livestock in which the Government held a security interest, was to be determined by state law. The statements, of course, do not rise to the dignity of regulations promulgated under statutory authority. They do carry persuasiveness, however, as an expression of the view of

those experienced in the administration of the Act who act with the advice of a staff specializing in its interpretation and application. See Overnight Motor Transp. Company v. Missel, 316 U.S. 572, 580, N. 17, 62 S.Ct. 1216, 86 L.Ed. 1682 (1941); Walling, Administrator v. Helmerich & Payne, Inc., 323 U.S. 37, 41-42, N. 5, 65 S.Ct. 11, 89 L.Ed. 29 (1944); Noonan v. Fruco Const. Co., 140 F.2d 633, 635 (8th Cir. 1943).

The majority of the Court has stressed the desirability of achieving nation-wide uniformity of decision and protection of the federal treasury as factors requiring the application of a uniform federal common law. While these factors may sometimes be of controlling importance on the choice of law issue, this is not always so, for they may be outweighed by countervailing considerations, United States v. Brosnan, 363 U.S. 237, 242, 80 S.Ct. 1108, 4 L.Ed.2d 1192 (1960). In Brosnan, one of the issues was whether a federal tax lien on personal property was extinguished by state proceedings taken by a prior chattel mortgagee. Obviously, protection of the federal treasury was involved. The Court recognized that the objective of the machinery for the collection of federal taxes was "'uniformity, as far as may be'," 363 U.S. at 241, 80 S.Ct. at 1111, 4 L.Ed.2d 1192, and that matters directly affecting the nature or operation of federal tax liens were federal questions. 363 U.S. at 240, 80 S.Ct. at 1110-1111, 4 L.Ed.2d 1192. Nevertheless, because the liens intruded upon property relationships "traditionally governed by state law", 363 U.S. at 240, 80 S.Ct. at 1111, 4 L.Ed.2d 1192, which were "long since settled and regulated by state law", 363 U.S. at 242, 80 S.Ct. at 1111, 4 L.Ed. 2d 1192, the Court concluded that state law was appropriate to govern the divestiture of federal tax liens and adopted it as a proper expression of federal law.

Whether in the case before us state law is directly applied because consistent with a Congressional purpose reflected in the agreement, the regulations and the departmental expressions of FHA policy, as it seems to me it should be, or is adopted as an appropriate measure of federal common law as was done in Brosnan and other decisions, makes no difference. For under either view, the liability of the defendant must be determined by the law of Pennsylvania.

In Pennsylvania there appears to be no case determining the liability of an auctioneer under circumstances comparable to those before us. It is, therefore, necessary to determine how a Pennsylvania Court would decide the question if it should be presented. In vicariously creating Pennsylvania law we may look to such sources as The Restatement of Law, treatises, law review commentaries, and the majority rule. Wright, Federal Courts, (Horn Book Series), 206 (1963).

It is the almost universally accepted rule that an agent, factor, commission merchant or auctioneer who receives property from his principal, sells it, and pays the proceeds to him is guilty of conversion if the principal has no title to the property, even though the agent acts without knowledge of the title defect. United States v. Union Livestock Sales Company, 298 F.2d 755, 760 (4th Cir. 1962); John Clay & Co. Livestock Commission v. Clements, 214 F.2d 803, 807 (5th Cir. 1954); 20 A.L.R. 97, 135; 7 Am.Jur.2d, Auctions and Auctioneers, § 68.

In both the Union Livestock Sales Company and Clements cases the title deficiency consisted of a recorded chattel mortgage lien. This was also true in Moloughney v. Hegeman, 9 Abb.N.C. 403 (N.Y.1880) and Coles v. Clark, 3 Cush. (Mass.) 339 (1849) referred to in the annotation in 20 A.L.R. at 138. Both Clements, 214 F.2d at 807, and Union Livestock Sales Company, 298 F.2d at 760, support their conclusions by citing § 349 of The Restatement of Agency in its original and revised forms, respectively.[3] In First National Bank of

---

3. Actually, there is no substantial difference between § 349 Agency, and § 349 Agency 2d.

Blairstown v. Goldberg, 340 Pa. 337, 17 A.2d 377, p. 379 (1941) the Court quoted § 349 of The Restatement of Agency as expressive of the "general rule" and added:

> "Ordinarily, it is no defense to an action of trover that the defendant acted on behalf of another, because, if the principal is a wrongdoer, the agent is a wrongdoer also."

In Pennsylvania, as elsewhere, an auctioneer who sells property for another does so as his agent. Gardiner v. Nichols Company, 48 Pa.Super. 510, 512–513 (1912); Restatement of the Law, Second —Agency 2d, § 1, Comment e, 11; United States v. Ferguson, 158 F.Supp. 814, 817 (D.C., E.D., Ark., W.D.1958); John Clay & Co. Livestock Commission v. Clements, 214 F.2d at 807; 7 C.J.S. Auctions and Auctioneers § 6a, p. 1247.

To be sure, First National Bank v. Goldberg, supra, bears no factual resemblance to the case before us. But the unanimity with which authorities have held auctioneers liable in conversion for selling a chattel subject to the lien of a recorded chattel mortgage, despite their lack of actual knowledge of the lien, and the approval by the Supreme Court of Pennsylvania of the principle stated in Restatement of Agency § 349 indicate that if the present case were before a Pennsylvania Court it would hold the defendant liable. Even without express approval by a state court of a Restatement principle, this Court has held the Restatement to be evidence of state law in the absence of direct local authority. Venuto v. Robinson, 118 F.2d 679, 682 (3rd Cir. 1941). Here there is even more reason for doing so.

I do not perceive, as defendant argues, that Seaboard Consumer Discount Co. v. Landau's, 167 Pa.Super. 180, 74 A.2d 737 (1950), and subsequent changes in the statutory law of Pennsylvania require a judgment in defendant's favor. The Landau's case arose under the Chattel Mortgage Act of June 1, 1945, P.L. 1358, Pa. Stat.Ann. tit. 21, § 940.1 (1954). The issue was whether an execution creditor who purchased at a judicial sale goods encumbranced by a chattel mortgage, and subsequently disposed of the goods without knowledge of the existence of the mortgage, was liable to the mortgagee for the value of the goods. The court held that it was not. The court stated that the mortgaging of chattels was looked upon with disfavor in Pennsylvania as a matter of public policy, and that the Chattel Mortgage Act should not be deemed to alter that public policy except to the extent of its express provisions. Since the Chattel Mortgage Act provided that a judicial sale should not divest the lien and that the title of a purchaser at judicial sale should be subject to it, the court concluded that the Act should not be extended to give to the chattel mortgagee a remedy which the Act had not specified.

The year following Landau, the Chattel Mortgage Act was amended by adding Section 13.1, Act of September 29, 1951, P.L. 1632. The amendment imposed liability for conversion upon a third party who took title to mortgaged goods with actual or constructive notice of the mortgage, and thereafter consumed or disposed of them.[4] Its purpose was apparently to expand the right of a mortgagee to enable him to reach a person in the position of the execution creditor which Landau had exonerated. Two years after § 13.1 was enacted, the Chattel Mortgage Act was repealed in its entirety and the Uniform Commercial Code was adopted. Act of April 6, 1953, P.L. 3, Pa.Stat.Ann., tit. 12A, § 1–101 et seq. (1954).

No provision of the Commercial Code expressly gives to a secured party a remedy against an auctioneer for conversion,

4. "Section 13.1. A mortgagee may, after default, replevin any goods subject to a chattel mortgage and in excess of one hundred dollars ($100) in value in the hands of a third person who took title to such goods with actual or constructive notice of the mortgage; or, if such goods have been consumed or are not in the possession of such third person, the mortgagee may recover the value of the goods in an action in trespass for conversion.'"

or indeed a remedy such as was granted by § 13.1 of the Chattel Mortgage Act. Pointing out that chattel mortgages are in disfavor in Pennsylvania, defendant argues that under the *rationale* of Landau, since the Commercial Code does not expressly grant a second party a remedy by way of conversion, it was not intended that he should have one. To buttress this argument defendant further asserts that the absence from the Code of a remedy against persons made liable by the repealed Section 13.1 of the Chattel Mortgage Act reflects legislative policy to reduce rather than expand the pre-existing rights of secured persons against third parties.

This argument is premised upon the declaration in Landau that chattel mortgages in Pennsylvania are viewed with disfavor as a matter of public policy. Properly considered, nothing in Landau militates against plaintiff's rights here. The prejudice against chattel mortgages expressed in Landau resulted from a desire to protect third persons such as innocent purchasers from and creditors of the mortgagor. First National Bank of Jamestown, N. Y. v. Sheldon, 161 Pa. Super. 265, 54 A.2d 61, 62 (1947). Prior to the enactment of the Chattel Mortgage Act of 1945 the lien of a chattel mortgage was held not to prevail against this class of persons, Kaufmann & Baer v. Monroe Motor Line Transportation, 124 Pa. Super. 27, 187 A. 296, 297 (1936). Subsequent to passage, the lien was not effective against such persons unless strict compliance with the statute was shown, First National Bank of Jamestown, N. Y. v. Sheldon, supra. The execution creditor who was exculpated in Landau fell within this protected class.

The theory of this line of cases is without application to a controversy between a mortgagee and a mortgagor or his agent. No Pennsylvania court appears to have disparaged the rights of a chattel mortgagee in this relationship. If a mortgagor should destroy the mortgaged chattel or sell it in the face of a covenant not to do so, nothing in the public policy of Pennsylvania or in reason would militate against permitting the mortgagee to recover from the mortgagor for conversion. Nor is there any public policy in Pennsylvania which would justify denying to a mortgagee a similar right against an agent of a mortgagor when the mortgagor utilized the agent as a means of selling the chattel.

The security agreement between the Government and Flickinger provided that on default the Government could "proceed to exercise any rights accorded by the Uniform Commercial Code." While the Code does not expressly authorize an insured party to sue for conversion, the Code leaves little doubt as to his right to do so.

§ 9–501(1) states that upon the occurrence of a default a secured party may reduce his claim to judgment, foreclose, or otherwise enforce the security interest by any available judicial procedure, and then adds, "The rights and remedies referred to in this subsection are cumulative." Pa.Stat.Ann. tit. 12A, § 9–501(1) (Supp.1962).[5] A cumulative remedy is one created by statute in addition to one which theretofore existed. Black's Law Dictionary (4th Ed.1951) 455; Bouvier's Law Dictionary, Vol. I, (Rawle's 3d Ed. 1914) p. 737.

§ 1–103 provides that the principles of law and equity shall supplement the terms of the Code unless displaced by particular provisions thereof. § 9–306, captioned in part "Secured Party's Rights on Disposition of Collateral", is discussed in Uniform Commercial Code Comment, paragraph 3, where it is stated that when

5. This provision was put into the Act by the 1959 Amendment; Oct. 2, P.L. 1023, § 9; 1959 Dec. 16, P.L. 1883, § 5, Pa. Stat.Ann. tit. 12A § 9–501 (Supp.1962). The transaction before us occurred prior to the amendment but suit was begun after January 1, 1960, its effective date. Act 1959, Oct. 2, P.L. 1023, Section 9, Pa.Stat.Ann. tit. 12A § 10–101 (Supp. 1962). The terms of the Amendment are applicable to the instant action. Act 1959, Oct. 2, P.L. 1023, Section 11, Pa.Stat. Ann. tit. 12A § 10–101 (Supp.1962).

a debtor makes an unauthorized disposition of collateral, the secured party may repossess the collateral from the purchaser or "in an appropriate case maintain an action for conversion." Pa.Stat. Ann. tit. 12A, § 9–306, at 418 (1954).[6] This is quoted as a correct expression of the law in Pennsylvania Law Encyclopedia, Secured Transactions, § 91.

The provisions of the Code in their totality make it clear that the granting of specific rights to a secured party was not intended to be a denial of others which he theretofore had under general principles of law. This view, as it relates to the particular problem before us, finds implicit substantiation in Erb v. Stoner, 19 Pa.Dist. & Co.R.2d 25 (C.P.1959). There, the court acknowledged without discussion that a secured party can recover "in trespass, in the nature of trover and conversion" from an auctioneer who sells mortgaged cattle without his consent. While, in contrast with the case before us, the auctioneer in Erb had personal knowledge of the security interest, the significance of the decision lies in the fact that a right to recover for conversion was recognized under the Code. See U. G. I. v. McFalls, 56 Lancaster Review 431 (C.P.1954).

Since the Commercial Code does not limit a secured party to the specific remedies provided by the Act, the rule that when the legislature has provided a remedy, it is exclusive, Schwab v. Burgess and Town Council, 407 Pa. 531, 180 A.2d 921, 923 (1962), has no relevance.[7]

I agree with the majority that there was no waiver by the FHA of its rights. The trial court found, upon the basis of

adequate evidence, that the cows were delivered to defendant and sold without the knowledge or express or implied consent of the FHA. A contrary finding was the basis of the decision in East Central Fruit Growers Products Credit Ass'n v. Zuritsky, 346 Pa. 335, 30 A.2d 133, 134 (1943) relied upon by defendant to support its defense of waiver.

For the reasons stated, I would affirm the judgment of the District Court.

---

6. As originally enacted in 1953, § 1–102(3) (f) stated that the Comments of the National Conference of Commissioners on Uniform State Laws might be consulted in construing and applying the Act unless the text and comment conflicted, in which event the text controlled. This provision was eliminated by the 1959 amendment, Oct. 2, 1959, P.L. 1023, § 1, because many of the original comments were out of date and it was not known when new ones could be prepared.

ALI NCUSL—1956 Recommendations of the Editorial Board for the Uniform Commercial Code, p. 3. Even without § 1–102(3) (f) the comments of a commission which drafts legislation are entitled to weight. Miles's Estate, 272 Pa. 329, 116 A. 300, 303 (1922).

7. This rule has its origin in Pa.Stat.Ann., tit. 42, § 156 (1952), Bartron v. North Hampton County, 342 Pa. 163, 19 A.2d 263, 265 (1941).