**UNITED STATES of America,**
**Plaintiff,**

v.

**Sandy SOMMERVILLE, trading and doing business under the name and style, New Wilmington Livestock Auction, Defendant.**

**Civ. A. No. 61-96.**

United States District Court
W. D. Pennsylvania.

Dec. 18, 1962.

Samuel J. Reich, Asst. U. S. Atty., Pittsburgh, Pa., for plaintiff.

Loyal H. Gregg, of Gregg & Price, Pittsburgh, Pa., for defendant.

MARSH, District Judge.

This is an action brought by the plaintiff against the defendant-auctioneer on a theory of conversion to recover the value of three cows sold by the defendant.

After non-jury trial, the court makes the following:

### FINDINGS OF FACT

1. Plaintiff is the United States of America suing on behalf of the Farmers Home Administration of the Department of Agriculture.

2. The defendant, Sandy Sommerville, is a licensed auctioneer of the Commonwealth of Pennsylvania and since 1946 has owned and operated the New Wilmington Livestock Auction in Mercer County, Pennsylvania.

3. On Monday of each week, commencing at 12:30 P.M., the defendant conducts an auction at which approximately 1300 head of livestock are sold. The livestock are brought to his auction from Mercer, Lawrence, Crawford, Venango, Butler and Jefferson Counties, Pennsylvania.

4. The livestock are brought to defendant's auction on the day of the sale, some as early at 7:30 A.M., and arrivals may continue throughout the day during the sale until 6:00 P.M. The livestock are marked and unloaded by defendant's employees. If there is sufficient time before the sale, the defendant's employees will rough grade the cows and place them in pens to await the sale. In other cases, the cattle may proceed directly from the unloading chutes to the sales ring. Just prior to entering the sales ring, all of the cows are weighed. As each cow is delivered into the ring, the auctioneer proceeds to auction it off to the highest bidder per hundred pound. After the auctioneer closes the bidding by striking his hammer, the seller still has the right to reject the bid if he does so before the next cow is brought into the ring. If the seller does

not reject the highest bid, the weight slip, with the price bid per hundred pound, is delivered to the office where the sales price and the auctioneer's commission are tabulated. The buyer pays for the livestock he has purchased and takes possession, and the seller collects his purchase money, less the auctioneer's commission. (R. 27, 28, 29, 30.) It is possible for some livestock to be sold within two to three minutes after they are delivered to the auction (R. 28), and it is possible for the seller to collect his money within ten minutes after the cows are sold (R. 37).

5. The United States Department of Agriculture through the Mercer County office of the Farmers Home Administration made loans from time to time during the period from March, 1954 to March, 1958 to Myron D. Flickinger, who operated a farm at Jackson Center in Mercer County, Pennsylvania (Stipulation and R. 7). As security for the repayment of said loans, Flickinger executed Security Agreements covering all of his personal property, including his farm equipment, crops and all of his livestock.

6. In 1957, Flickinger was in default on his loans to the Farmers Home Administration and actually sold cattle which were subject to the Security Agreement held by the Government. Upon learning of this default, the Farmers Home Administration took no action, either civil or criminal, against the said Flickinger. (R. 8, 9.)

7. In 1958, the Farmers Home Administration made a further loan to Flickinger and took back another Security Agreement (Govt. Ex. 1) covering all of Flickinger's farm equipment, crops and livestock as security for loans totaling $4,161.14.

8. This Security Agreement prepared and executed by the Department of Agriculture specifically provides that it is "intended by the parties to serve as both 'Financing Statement' and 'Security Agreement' under Pennsylvania law".

9. This Security Agreement was duly recorded in the Recorder's Office of Mer-

cer County, Pennsylvania, at 2:30 P.M. on July 10, 1958.

10. At his auction on March 30, 1959, defendant sold a Holstein cow for $177.-49; on April 6, 1959, a Guernsey cow for $143.50, and at some undisclosed time, a Jersey cow for $56.50, all of which were covered by the Security Agreement. These three cows were delivered to defendant's auction by Flickinger, who represented that he was the owner of the cows, and that there were no liens or encumbrances against the cows. The purchase money, less the defendant's commission, was turned over to Flickinger after the sale (Stipulation ¶ 5 and Additional Stipulation, which was filed on August 14, 1962.)

11. The three cows were delivered to the auction and sold without the knowledge and without the express or implied consent of the Farmers Home Administration.

12. Defendant had no actual knowledge of the plaintiff's security interest in the cows (Stipulation ¶ 6).

13. In April of 1959, the Farmers Home Administration learned that Flickinger had sold the cows in question (R. 11, 12).

14. The Farmers Home Administration took no action against Flickinger, except to urge him to conduct a liquidation sale of all of his property. In November of 1959, Flickinger did hold a public sale of all of his property and paid the proceeds over to the Farmers Home Administration. (R. 12, 13.) After payment of the proceeds to the Administration, Flickinger owed a remaining indebtedness, including interest, as of August 2, 1962, of $551.69 (Additional Stipulation filed December 7, 1962).

15. The Farmers Home Administration gave no notice to the defendant that Flickinger had sold the three cows covered by the Security Agreement (R. 13, 14), and defendant had no knowledge of the matter at all until he was served with a copy of the complaint in the instant proceedings on February 20, 1961 (R. 34, 35).

16. On the average, at any given time, there are approximately 190 farmers who are borrowers from the Farmers Home Administration in Mercer' County alone (R. 14).

17. Prior to the transaction involved in the present litigation, the defendant had paid three separate claims made by the Government for livestock which had been sold at his auction at times when the Farmers Home Administration had a recorded security interest in the livestock (R. 30).

18. The Farmers Home Administration did not send to defendant a list of the farmers who had borrowed money from the Government in Mercer County, Pennsylvania, prior to the time of the sales involved in this suit (R. 31).

## DISCUSSION

■ Although I think the result of this case would be the same whether federal law or state law applied, I am of the opinion that state law was intended to govern the rights of the parties. The Security Agreement involved (Govt. Ex. 1) was a Pennsylvania form. The personal property involved was located in Pennsylvania. The Security Agreement specifically provided that the parties intended it "to serve as both 'Financing Statement' and 'Security Agreement' under Pennsylvania law", and in case of default by the debtor, the Government, in addition to certain enumerated rights, "may proceed to exercise any rights accorded by the Uniform Commercial Code". Act of April 6, 1953, Pa. Pamphlet Laws 3, § 1–101 et seq.; 12A Purdon's Pa.Stat.Ann. § 1–101 et seq., particularly § 1–105(a), (hereinafter referred to as the Code). Section 9–102 of the Code and the Comments thereto make it clear that the law of the state where the collateral is located should be the controlling law, without regard to possible contacts in other jurisdictions. Section 9–104 excludes the application of the Code to the extent that the rights of the parties to the transaction are governed by a statute of the United States, but the federal statute involved here makes no provision for the type of transaction which gives rise to this action. See: The Bankhead-Jones Farm Tenant Act of 1937, as amended, 7 U.S.C.A. § 1007.

In addition, the weight of authority is to the effect that state law should be applied in this situation. United States v. Union Livestock Sales Company, 298 F. 2d 755 (4th Cir.1962); United States v. Kramel, 234 F.2d 577 (8th Cir.1956); contra United States v. Matthews, 244 F.2d 626 (9th Cir.1957). In In re Philadelphia Penn Worsted Company, 278 F. 2d 661, 663 (3d Cir.1960), it was stated:

"Since the auctioneer's sale and contract of sale with appellants were consummated in Pennsylvania the law of that State determines their legal consequence." [1]

It seems to be generally held in the federal and state courts that an agent is liable to the owner of property if he takes part in a wrongful conversion even though he has no knowledge that a wrongful conversion has taken place. United States v. Union Livestock Sales Company, supra; United States v. Matthews, supra; John Clay & Co. Livestock Commission v. Clements, 214 F.2d 803 (5th Cir.1954); 2 Am.Jur., Agency, § 328; 5 Am.Jur., Auctions, § 60; 22 Am.Jur., Factors, § 48; 2 Jones, Chattel Mortgages, § 460 (1933); 20 A.L.R. 97, 132–138. This rule is explicitly set forth in the Restatement of the Law of Agency 2d, § 349:

"Conversion
An agent who does acts which would otherwise constitute trespass to or conversion of a chattel is not relieved from liability by the fact that he acts on account of his principal and reasonably, although mistakenly, believes that the principal is entitled to possession of the chattels."

With this rule the law of Pennsylvania seems to be in accord. See: McDonald v. First Nat. Bank of McKeesport, 353

---

1. In the cited case it appears that the auctioneer who knocked down the property was acting as agent for the seller.

Pa. 29, 44 A.2d 265 (1945); see also, Pennsylvania Annotations to the Restatement of Agency, § 349; P.L.E. Agency § 129; Sum.Pa.Jur. Agency, § 182.

To the same effect is the rule set forth in the Restatement of the Law of Torts (1948 Supp.), § 233(1):

"Except as stated in Subsection (2), one who as agent or servant of a third person disposes of a chattel to one not entitled to its immediate possession in consummation of a transaction negotiated by the agent or servant is liable for a conversion to another who, as against his principal or master, is entitled to the immediate possession of the chattel."

Pennsylvania law seems to be in accord with this section. See: Lindsley v. First Nat. Bank of Philadelphia, 325 Pa. 393, 190 A. 876 (1937); Sum.Pa.Jur. Torts, § 390.

Both the agency rule and the tort rule have received approval in the dictum contained in First Nat. Bank of Blairstown v. Goldberg, 340 Pa. 337, 17 A.2d 377 (1941).

In my opinion there is little doubt that an auctioneer is an agent of the seller when he receives the chattel for sale, conducts the sale, sells the chattel upon the fall of the hammer, receives the proceeds from the buyer, and distributes the proceeds less his commission to the seller. See: Restatement, Second, Agency § 1, Comment (e). The auctioneer negotiates such a sale and the seller's unexercised right to reject the bid would not alter the relationship of principal and agent.

In Gardiner v. D. P. S. Nichols Co., 48 Pa.Super. 510 (1912), the defendant company was engaged in the auction business. The Court said at pp. 512–513:

"It must be apparent that the relation between the plaintiff and defendant, created when the horse was delivered to the former to be by it sold, was that of principal and agent."

See also, Hayes v. D. P. S. Nichols Co., 64 Pa.Super. 273 (1916); Vol. 4 Words and Phrases, "Auctioneer" p. 808.

It also seems certain that a wrongful sale of property by an agent-auctioneer, whereby a lienholder is deprived of his right, is a conversion. United States v. Union Livestock Sales Company, supra; United States v. Matthews, supra; John Clay & Co. Livestock Commission v. Clements, supra; 89 C.J.S. Trover and Conversion § 48b; 14 C.J.S. Chattel Mortgages § 261; 2 Am.Jur., Agency, § 331; 2 Jones, Chattel Mortgages, § 460 (1933).

For the reasons exhaustively set forth in United States v. Matthews, supra, 244 F.2d at pages 630–631, the provisions of the Packers and Stockyards Act of 1921, 7 U.S.C.A. § 181 et seq., and particularly § 205, do not absolve the defendant from liability. For substantially the same reasons, it is my opinion that the Pennsylvania statutes regulating auctioneers cannot be construed as exculpating an auctioneer from the rules of liability set forth above. Cf. United States v. Union Livestock Sales Company, supra, 298 F.2d at p. 760; John Clay & Co. Livestock Commission v. Clements, supra, 214 F.2d at p. 807; contra United States v. Kramel, supra.

The defendant contends that the Government waived any rights it may have had for the disposition of the collateral, citing East Central Fruit Growers Production Credit Ass'n v. Zuritsky, 346 Pa. 335, 30 A.2d 133 (1943). I am unable to find from the evidence any intended waiver on the part of the Government. Certainly, the Government did not expressly or impliedly consent to the sales of the mortgaged cows. Indeed, to the contrary, on three prior occasions the defendant paid claims made by the Government against him for selling mortgaged cows. Because of this, defendant was very much aware that the Government not only did not relinquish its right but expected to and did enforce its right to recover for the conversions from him. Although the Government cannot be es-

topped, it is clear that its agents did nothing by word or act upon which defendant relied which could be reasonably construed as an inducement to defendant to sell the mortgaged cows without incurring liability.

The defendant argues that it is not possible for him to protect himself, and that because the Farmers Home Administration did not furnish a list of borrowers, it did not act in good faith, and, therefore, cannot recover. I disagree with this argument. The Security Agreement with the mortgagor was recorded in the Recorder's Office of Mercer County in accordance with the Code, § 9–401; and although the Code, § 9–201, does not expressly visit constructive notice upon auctioneers, if defendant wished to protect himself, there was nothing to prevent him from searching the records in the various County Recorders' Offices, compiling a list of mortgagors to the Farmers Home Administration, and keeping the list reasonably current, thereby effectively minimizing the risk of loss resulting from the occasional dishonesty of a person such as the mortgagor in this case. I do not find any legal or good faith obligation on the part of the Government to furnish lists of borrowers to auctioneers.

The fact that defendant was not given notice or that no demand was made upon him prior to suit does not exculpate him from liability for the conversion of the cows. Cf. Rice v. Yocum, 155 Pa. 538, 26 A. 698 (1893); 89 C.J.S. Trover and Conversion §§ 56c, 57.

### CONCLUSIONS OF LAW

1. This court has jurisdiction of the subject matter and of the parties to this action.

2. The sale by the defendant of the cows subject to the Security Agreement between Myron D. Flickinger and the Farmers Home Administration of the United States constituted a conversion of said cows.

3. The Farmers Home Administration did not waive any of its rights against the defendant nor is it estopped from asserting same.

4. The defendant is liable to the United States for converting the cows subject to the Security Agreement in the following amounts:

   (a) $177.49 for the conversion of the Holstein cow;

   (b) $143.50 for the conversion of the Guernsey cow;

   (c) $56.50 for the conversion of the Jersey cow;

or a total amount of $377.49.

5. Judgment in the sum of $377.49 should be entered in favor of the United States and against Sandy Sommerville, trading and doing business under the name and style, New Wilmington Livestock Auction.