425 P.2d 726

**The CLOVIS NATIONAL BANK, Clovis, New Mexico, a corporation, Plaintiff-Appellant,**

v.

**Harold THOMAS, d/b/a Clovis Cattle Commission Company, Defendant-Appellee.**

**No. 7876.**

Supreme Court of New Mexico.

March 27, 1967.

Rowley, Davis, Hammond & Murphy, Clovis, for appellant.

Seth, Montgomery, Federici & Andrews, John G. Jasper, Santa Fe, amicus curiae.

Richard C. Civerolo, H. L. Cushing, Pete V. Domenici, Albuquerque, for appellee.

## OPINION

OMAN, Judge, Court of Appeals.

This is a suit by plaintiff-appellant for alleged conversion of cattle by defendant-appellee. The parties operate their respective businesses in Clovis, Curry County, New Mexico, and will be referred to as plaintiff and defendant.

In its capacity as a bank, plaintiff, on March 27, 1963, loaned the sum of $8,800

to a Mr. W. D. Bunch. To evidence and secure the indebtedness he gave plaintiff a promissory note and a security agreement by which he granted a security interest in about 46 head of cattle belonging to him and branded "W D Bar." On April 11, 1963, a further security agreement, granting a security interest in 102 head of cattle, was given by him to plaintiff as additional security for the loan of March 27, and as security for additional loans to be made to him by plaintiff from time to time.

On July 29, 1963, he deposited $3,507 with plaintiff. This money represented proceeds from the sale by him of 35 head of cattle covered by the security agreements. $3,300 of this amount was applied by plaintiff on the indebtedness then owing by him.

On October 29, 1963, he deposited with plaintiff the sum of $5,613.17, the total amount of which was applied to his indebtedness, and which amount represented proceeds from the sale by him of 56 head of cattle covered by the security agreements. This deposit consisted of two checks given by defendant, who is a licensed commission house and market agency and as such handled the sale of the cattle for him.

Plaintiff admitted to being aware that Mr. Bunch was making sales of cattle covered by the security agreements.

In about September 1963, he made application to plaintiff for an additional loan with which to purchase additional cattle and with which to carry his cattle through the winter. An investigation was made by plaintiff during September, to determine the feasibility of granting this additional loan. Plaintiff approved the loan, and cattle were acquired by him and paid for by drafts drawn on plaintiff. By November 12, 1963, the additional cattle had been acquired.

On November 12, a new note in the principal amount of $21,500 and a new security agreement covering 283 head of cattle branded W D Bar were given by him to plaintiff to evidence and secure his then indebtedness. This indebtedness in the amount of $21,500 represented $2,007.67 still owing on the original note of March 27, $2,743.10 credited to his checking account on November 12, and amounts loaned or advanced to him during the intervening period. The security agreement was duly recorded in both Curry and Quay counties and in part provided:

"DEBTOR FURTHER REPRESENTS WARRANTS, AND AGREES THAT:
" * * *.

"Without the prior written consent of Secured Party, Debtor will not sell, * * * or otherwise dispose of the Collateral. * * *"

Thereafter, cattle covered by the November 12 security agreement were consigned to defendant by Mr. Bunch for sale on his behalf at public auction. The plaintiff

had no actual knowledge of these sales and had not given any express consent to Mr. Bunch to make the sales. He remitted no part of the proceeds from these sales to the plaintiff for application on his indebtedness. The sales were of 45 head of cattle on February 20, 1964, 31 head on March 12, 1964, one head on April 16, 1964, 95 head on May 14, 1964, and one head on May 21, 1964. The total value of these cattle was $16,450.34, and plaintiff sought recovery from defendant of this amount under the first cause of action of its complaint.

Mr. Bunch has a son by the name of William D. Bunch, Jr., also known as Bill Bunch, Jr., who will be referred to either by name or as the son. The son was the owner of a brand referred to as "Swastika K." Some time prior to July 15, 1964, at least 90 head of cattle were acquired by either Mr. Bunch or his son and were branded Swastika K. There was some evidence tending to show that these cattle, at least to some extent, were actually property of the father. No security agreement was ever given by either the father or the son by which a security interest in cattle branded Swastika K was granted to the plaintiff, unless in some way it can be held that they were covered by the security agreement of November 12.

On July 15, 1964, plaintiff requested that Mr. Bunch sell the remainder of his cattle, including the Swastika K cattle.

On the following day, 90 head of Swastika K cattle were trucked to defendant's place of business for sale and were carried on the defendant's records as belonging to Bill Bunch, Jr. Plaintiff knew the cattle were at defendant's place of business to be sold and told defendant that plaintiff claimed some interest in the cattle. Defendant was not told the nature or extent of the claimed interest of plaintiff in these cattle.

The cattle were sold on July 16. Plaintiff was aware of the sale and advised defendant that it would be "nice" if the check in payment for these cattle could be made payable to one or both of the Bunches and to the plaintiff. At no time did the plaintiff demand payment or request that defendant not make payment to Bill Bunch, Jr.

Bill Bunch, Jr. consulted the local brand inspector and solicited his aid in securing payment from defendant. The brand inspector advised defendant that the Swastika K brand was recorded in the name of Bill Bunch, Jr., and that insofar as the Cattle Sanitary Board was concerned, payment could be made to him.

An attorney also called defendant on behalf of Bill Bunch, Jr. concerning payment for the cattle, and demand was made by Bill Bunch, Jr. upon defendant to pay him the proceeds from the sale of the cattle. This the defendant did on July 22. This payment was in the amount of

$7,777.84, which is the amount of plaintiff's claim against defendant under the second cause of action.

On this same date, plaintiff filed suit against W. D. Bunch and William D. Bunch, Jr., wherein plaintiff sought to recover from the father on the note of November 12, and sought to recover from the son the said sum of $7,777.84. In this proceeding plaintiff filed an affidavit in support of an application for a writ of garnishment, wherein it was asserted that defendant was indebted to William D. Bunch, Jr. No claim was made that the proceeds from the sale belonged to plaintiff, but rather plaintiff asserted that the proceeds belonged to William D. Bunch, Jr., and, as already stated, tried to reach these proceeds by garnishment, which came too late. The present suit was then filed against defendant on August 31, 1964.

The plaintiff asserts thirteen separate points relied upon for reversal. However, the ultimate conclusions upon which the judgment for defendant rests are (1) that plaintiff consented to the sales of W D Bar cattle covered by the security agreement of November 12, and thus waived any possessory rights it may have had in these cattle, and (2) that plaintiff had no perfected security interest in the Swastika K cattle, and failed to prove an unperfected security interest in these cattle of which defendant had knowledge.

Insofar as the sales of the W D Bar cattle are concerned, the trial court found plaintiff, as a matter of common practice, usage and procedure, permitted Mr. Bunch to sell cattle covered by the security agreements of March 27 and April 11, and consented to receipt of the sale proceeds by Mr. Bunch. It also found that plaintiff, by common practice, custom, usage and procedure, permitted and consented to the sales of W D Bar cattle covered by the security agreement of November 12, and permitted and consented to the receipt by Mr. Bunch of the proceeds from these sales.

The trial court concluded that plaintiff had permitted, acquiesced in, and consented to these sales; that by its conduct, plaintiff had waived any possessory rights it may have had in and to these cattle; that defendant did not wrongfully convert cattle in which plaintiff had an enforceable security interest; and that defendant was not responsible for the debtor's failure to remit the proceeds of the sales to plaintiff.

We agree with the findings and conclusions of the trial court. Insofar as consent and waiver on behalf of plaintiff are concerned, in addition to the facts recited above, the plaintiff's officers testified that it was the custom and practice of plaintiff to permit a debtor, who has given cattle as collateral, to retain possession and to sell the collateral without ever obtaining prior written consent of

plaintiff, and that at no time in its dealings with Mr. Bunch between the time of the making of the note on November 12, 1963, and the sale of cattle on May 21, 1964, did plaintiff demand of him that he obtain prior written consent before making a sale.

It is true there was some testimony that the collateral was not released from the lien until the debtor actually delivered the proceeds of the sale to plaintiff, but, as testified to by one of the plaintiff's officers, the debtor never contacts the plaintiff and secures permission to make a sale, but the sale is made and plaintiff relies upon the debtor to bring the proceeds to plaintiff to be applied on the indebtedness. This practice is followed because 99% of the people with whom plaintiff deals are honest and take care of their obligations.

The general rule of liability of an auctioneer, who sells, in behalf of his principal, property subject to a mortgage lien, is stated as follows in the annotation at 96 A.L.R.2d 208, 212 (1964):

> "According to the overwhelming weight of authority, an auctioneer who sells property in behalf of a principal who has no title thereto or who holds the property subject to a mortgage or other lien, or who for other reasons has no right to sell such property, is personally liable to the true owner or mortgagee for conversion regardless of whether he had knowledge, actual or constructive, of the principal's lack of title or want of authority to sell, in the absence of facts creating an estoppel or showing acquiescence or consent on the part of the true owner or mortgagee. * * *"

The trial court, in addition to holding plaintiff had consented to and acquiesced in the sales and had waived his possessory rights in the cattle, concluded plaintiff was estopped from recovery by reason of its conduct. The plaintiff and the amicus curiae have both made strong attacks on this conclusion. We are inclined to agree that the essential elements of an estoppel are lacking. We do not, however, predicate our decision upon estoppel, but rather upon consent and waiver.

The plaintiff, if not expressly consenting to the questioned sales, certainly impliedly acquiesced in and consented thereto. It not only permitted Mr. Bunch, but permitted all its other debtors who granted security interests in cattle, to retain possession of the cattle and to sell the same from time to time as the debtor chose, and it relied upon the honesty of each debtor to bring in the proceeds from his sales to be applied on his indebtedness.

Plaintiff was fully aware of its right to require its written authority to sell or otherwise dispose of the collateral, but it elected to waive this right. Waiver is the intentional abandonment or relinquishment of a known right. Smith v.

New York Life Ins. Co., 26 N.M. 408, 193 P. 67; Miller v. Phoenix Assur. Co., Ltd., 52 N.M. 68, 191 P.2d 993.

In Farmers' Nat. Bank v. Missouri Livestock Comm. Co., 53 F.2d 991 (8th Cir. 1931), suit was brought by the holder of chattel mortgages for alleged conversion of cattle by a livestock commission house. Although the facts are dissimilar from those of the present case, that case does stand for the principle that consent may be established by implication arising from a course of conduct as well as by express words, and that consent to a sale operates as a waiver of the lien or security interest. See also Moffet Bros. & Andrews Comm. Co. v. Kent, 5 S.W.2d 395 (Mo.1928).

In First Nat. Bank & Trust Co. of Oklahoma City, Okl. v. Stock Yards Loan Co., 65 F.2d 226 (8th Cir. 1933), the effect of a course of conduct on the part of a mortgagee, such as was followed by the mortgagee in that case and such as was followed by plaintiff in the present case, was stated to be:

> " * * * When a mortgagee under a chattel mortgage allows the mortgagor to retain possession of the property and to sell the same at will, the mortgagee waives his lien, and this is true whether the purchaser knew of the existence of the chattel mortgage or not."

> *　　*　　*　　*　　*　　*

The fact that plaintiff may have intended that the proceeds from the sales of cattle covered by the security agreements should be remitted to plaintiff by Mr. Bunch for application on his indebtedness did not change the waiver. When plaintiff consented to the sales and the collection of the proceeds of the sales by him, it lost its security interest in the collateral and was then looking to him personally for payment. First Nat. Bank & Trust Co. of Oklahoma City, Okl. v. Stock Yards Loans Co., supra; Moffet Bros. & Andrews Comm. Co. v. Kent, supra. See also Producers Livestock M. Ass'n v. John Morrell & Co., 220 Iowa 948, 263 N.W. 242; United States v. Hansen, 203 F.Supp. 326 (S.D. Iowa 1962), aff'd 311 F.2d 477 (8th Cir. 1963); 14 C.J.S. Chattel Mortgages § 262 at 874 (1939); 15 Am.Jur.2d Chattel Mortgages §§ 150–153 at 320–324 (1964).

Plaintiff relies upon our language in Security State Bank v. Clovis Mill & Elevator Co., 41 N.M. 341, 68 P.2d 918, as support for its position that there could have been no consent or waiver by the plaintiff in the present case.

The language relied upon is as follows:

> " * * * The custom, however, cannot prevail against a statute which requires purchasers of mortgaged property to take notice of such chattel mortgages when filed in the office of the county clerk. A custom will not prevail against a statute or the terms of a contract in conflict with it."

> *　　*　　*　　*　　*　　*

This language, and particularly the language of the last sentence, if taken completely from context and if taken as stating a correct principle of law applicable in all cases wherein a custom is inconsistent with the provisions of a statute, or the terms of a contract, would lend support to plaintiff's position. However, consent and waiver were not even involved in that case. In that case,

"Appellant contended, and introduced testimony tending to prove, that there was a custom in Curry county at the time the grain in question was bought, for purchasers dealing in grain to rely upon evidence furnished them by mortgagors as to the existence of mortgages on grain crops, so that grain dealers would be protected against buying mortgaged property. * * *"

* * * * * *

In that case the purchaser of mortgaged property sought to relieve itself from legal liability to the mortgagee by relying upon a claimed custom of purchasers in a like position. This is far from consent and waiver arising by implication from a course of conduct or custom on the part of the party vested with the right which is waived.

Since the Uniform Commercial Code, ch. 50A, N.M.S.A.1953, was adopted in New Mexico in 1961 and prior to the transactions here involved, the question arises as to whether or not the provisions of this code require application to the facts of this case of rules different from those above stated. We think not.

The collateral here in question—livestock, falls within the classification of "farm products," and these products are expressly excluded from the classifications of "equipment" and "inventory." Section 50A–9–109(3), N.M.S.A.1953. By excluding "farm products" from the classifications of "equipment" and "inventory," and by expressly providing in § 50A–9–307(1), N.M.S.A.1953, that a buyer in the ordinary course of business of farm products from a person engaged in farming operations does not take free of a security interest created by the seller, the draftsmen of the code apparently intended "to freeze the agricultural mortgagee into the special status he has achieved under the pre-code case law." 2 Gilmore, Security Interests in Personal Property 714 (1965).

It would only seem logical and consistent that if the buyer from one engaged in farming operations takes subject to the security interest, then the selling agent is subject to the rights of the secured party in the collateral. This is consistent with the foregoing cited authorities. See also United States v. Union Livestock Sales Co., 298 F.2d 755, 96 A.L.R.2d 199 (4th Cir. 1962); United States v. Matthews, 244 F. 2d 626 (9th Cir. 1957).

Section 50A–9–306(2), N.M.S.A.1953 provides:

"Except where this article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof by the debtor unless his action was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor."

 No section of the code provides otherwise as to farm products. Thus, the holder of the security interest in farm products has the same protection under the code which he had under the pre-code law, and the cattle broker is still liable to the secured party for conversion of the collateral. United States v. Sommerville, 211 F.Supp. 843 (W.D.Pa.1962), aff'd. on other grounds, 324 F.2d 712 (3rd Cir. 1963), cert. denied 376 U.S. 909, 84 S.Ct. 663, 11 L.Ed.2d 608 (1964). See also 2 Gilmore, Security Interests in Personal Property 715 (1965).

 Also, under the code the secured party may consent to the sale of the collateral, and thereby waive his rights in the same. See Official Comment No. 3, § 9-306, and Official Comment No. 2, § 9-307. There being no particular provision of the code which displaces the law of waiver, and particularly waiver by implied acquiescence or consent, the code provisions are supplemented thereby. Section 50A-1-103, N.M.S.A.1953. The defendant cannot be held liable for a conversion of the W D Bar cattle, because plaintiff consented to and acquiesced in the sales thereof, and thereby waived its rights in this collateral.

Insofar as the alleged conversion of the Swastika K cattle is concerned, we are of the opinion that plaintiff must also fail in this claim.

The security agreement makes no reference to any cattle so branded. There is no contention that these cattle were "the natural increase" of the W D Bar cattle, which increase would have been covered by the security agreement.

Section 50A-9-306(2), N.M.S.A.1953, provides that a security interest "continues in any identifiable proceeds" received by the debtor. Identifiable proceeds might be goods purchased with money received from the sale of the original collateral. Girard Trust Corn Exchange Bank v. Warren Lepley Ford, Inc., 25 Pa.Dist. & Co.R.2d 395 (1958). Assuming only for the sake of argument that we were to hold that the Swastika K cattle were purchased with monies received from the sale of the collateral,—W D Bar cattle—and assuming further we were to hold that the Swastika K cattle were identifiable proceeds, a security interest in these cattle continued to be perfected only for a period of ten days after the receipt by Mr. Bunch of the proceeds from the sales of the W D Bar cattle, (1) because the filed financing statement did not cover proceeds, and (2) because no security interest was perfected

in these proceeds before the expiration of the ten-day period.

There is nothing in the record in this case to indicate a source of any possible security interest in plaintiff in these Swastika K cattle, except for the security agreement of November 12.

The plaintiff contends that it gave notice to defendant of its interest in these cattle, and that defendant, having actual knowledge of plaintiff's unperfected security interest therein, dealt with the cattle subject to plaintiff's rights. As above stated, plaintiff did not inform defendant as to the nature and extent of plaintiff's claimed interest in these cattle, but it did direct considerable trial effort toward establishing, at least to some extent, the ownership of these cattle in Mr. Bunch.

■ The trial court found that there was no evidence that Mr. Bunch was the owner of these cattle. Plaintiff attacks this finding and further asserts that the trial court erred in refusing the admission of certain evidence which would have tended to establish that he was the owner. Although there is some little evidence that Mr. Bunch was the owner of these cattle, or at least was the owner of an interest in the same, there is ample evidence to support a finding that he was not the owner. However, we do not conceive ownership of the cattle to be the determining factor in deciding whether or not plaintiff had an un-

perfected security interest in these cattle of which defendant had actual notice or knowledge.

As a part of the same finding of fact in which the court found there was no evidence that Mr. Bunch was the owner of the Swastika K cattle, it also found that there was no evidence that these cattle were acquired with proceeds from the sale of any cattle covered under the November 12 security agreement. With this we agree. The point under which this finding is attacked concerns itself solely with the claimed error of the court in refusing to admit certain statements as to ownership of these cattle, and in refusing to adopt plaintiff's requested finding #8.

Ownership of the cattle in Mr. Bunch, even had it been clearly established, does not mean that they constituted identifiable proceeds of the sales of W D Bar cattle.

■ Not only has plaintiff failed in his appropriate point to call to our attention any error of the court in finding that there was no evidence that the Swastika K cattle were acquired with proceeds from the sale of collateral, but has failed to demonstrate the error by argument and authorities. Under these circumstances, this court will not search the record in an attempt to discover error on the part of the trial court. Petty v. Williams, 71 N.M. 338, 378 P.2d 376. Findings of fact not directly attacked become the findings in the

reviewing court. Hutchison v. Boney, 72 N.M. 194, 382 P.2d 525.

Plaintiff's requested finding of fact #8 in no way aids the position of plaintiff. The material portion of this request was:

"* * * that said cattle were not owned by Bill Bunch, Jr., but were owned by W. D. Bunch and were similar collateral acquired as provided in the security agreement."

Plaintiff has failed to point out what it means by "similar collateral acquired as provided in the security agreement," or how this in any way could be said to demonstrate error on the part of the trial court in finding as it did.

As its thirteenth point, plaintiff asserts:

"THAT THE TRIAL COURT ERRED IN REFUSING TO ADMIT THE STIPULATION ENTERED INTO BETWEEN COUNSEL FOR CLOVIS NATIONAL BANK AND COUNSEL FOR W. D. BUNCH AND BILL BUNCH, JR., IN THE PRIOR CASE WHEREIN THE CLOVIS NATIONAL BANK SUED W. D. BUNCH AND BILL BUNCH, JR., ON THE NOTE IN QUESTION."

The stipulation was verbal in nature, but had been transcribed by the court reporter in the prior case. It was entered into in the suit brought by plaintiff against Mr. Bunch and his son, and to which suit reference is above made. The tender of this stipulation was based on a claim that it constituted an exception to the hearsay rule and was a judicial admission. The stipulation pertained almost entirely to the matters of the form and amount of judgment that might be entered in favor of plaintiff against Mr. Bunch and his son. The only portion thereof in any way relating to the Swastika K cattle was the following explanation made by plaintiff's attorney, and the response thereto by the attorney for Mr. Bunch and his son:

* * * * * *

"* * * By way of explanation, there were 90 head of cattle sold for the $7784. and some odd cents which is covered by the second cause of action, the proceeds were taken by the younger man and delivered to his father as we understand it with full knowledge that the bank knew that these cattle had been purchased to a large degree anyway with proceeds of cattle that had been sold and upon which the bank did have a lien.

"Is that accurate, Mr. Buzzard? [Counsel for the Bunches]

"MR. BUZZARD: I think so, we had not given much thought to the manner of the drawing of a judgment."

* * * * * *

In view of the uncertainty of both counsel as to what the facts were regarding the amount of the proceeds, if any, from the sale of the W D Bar cattle which

had been used for purchasing the 90 head of Swastika K cattle, the doubt as to whether the statements of counsel did in fact amount to a stipulation, and the circumstances surrounding its making, we are of the opinion that the relevancy and probative effect thereof were so questionable that the trial court properly excluded the same, and certainly did not abuse its discretion in refusing the tender.

We have carefully considered all other points and matters urged upon us by plaintiff and amicus curiae, but we find the same to be without merit, or to be insufficient upon which to predicate reversible error.

It follows from what has been stated that the judgment should be affirmed. It is so ordered.

CHAVEZ, C. J., and NOBLE and COMPTON, JJ., concur.

CARMODY, Justice (dissenting).

The consequences and repercussions that today's decision will have on security interests involving farm products and the applicability of the Commercial Code to such transactions are incalculable. Thus, even though it may sound like "a voice crying in the wilderness," I feel required to respectfully voice my dissent.

My disagreement relates to three separate facets of the majority opinion, i. e., (1) the disposition of the waiver contention, (2) the conclusion as to the Swastika K cattle, and (3) the statement by the majority that the Commercial Code does not require application to these facts rules differing from the pre-code law.

THE WAIVER:

Apparently, the majority finds a waiver on the basis that plaintiff permitted Bunch and other debtors to retain possession of cattle and to sell them at the time the debtor chose, and relied upon the honesty of the debtor to bring the proceeds of the sales to the bank. There is not one word in the record that the plaintiff had any knowledge of sales by Bunch from the time of the signing of the security instrument until after the last sale was made. The majority says that the plaintiff was aware of its right to require written authority, but it elected to waive this right. At the most, the record discloses merely a failure by the plaintiff to insist on its right to a written consent, as provided in the security agreement, but this was at a time when plaintiff had no knowledge that the cattle were being, or had been, sold. This was not an intentional relinquishment of a known right, Miller v. Phoenix Assur. Co., Limited, of London, 1948, 52 N.M. 68, 191 P.2d 993. Plaintiff had the known right that the cattle not be sold without written consent, so, absent knowledge of the sales, there could be no intentional relinquishment of the right. Intentional relinquishment must of necessity be based upon knowledge of the facts, and this must be true as to the

law of waiver generally and waiver by implied acquiescence or consent, which is apparently relied upon by the majority. Actually, the conduct of the plaintiff relied upon is more in the nature of that upon which estoppel is frequently based; however, the majority and I agree that the essential elements of estoppel are lacking in this case.

The majority places great reliance on First National Bank & Trust Co. of Oklahoma City, Okl. v. Stock Yards Loan Co. (8th Cir. 1933), 65 F.2d 226, and says that the course of conduct on the part of the bank in that case was such as was followed by the plaintiff here. In that case, the court based its decision on general inattention to the status of the cattle, the lack of care on the part of the bank as to the location of the cattle at the time of the making of the mortgage, lack of care as to the movements of cattle from county to county, all as tending to emphasize a lack of care by the bank; in such a situation, the court found a waiver. The situation in the instant case is far different. Here the evidence showed only the unauthorized sales and a claimed common practice and usage to depend on the honesty of cattlemen.

A case much closer on facts, and cited by the majority but on another point and ignored as to the waiver problem, is United States v. Sommerville (3d Cir. 1964), 324 F.2d 712, in which the facts relied upon to show a waiver were much stronger than in the instant case, yet the court refused to find a waiver. There, the facts were that the lending agency had loaned money, even though there were previous defaults and sales of secured livestock, had refused to supply auctioneers with lists of livestock, and did not give notice to the appellant auctioneer that it was going to look to him for payment, but merely filed suit after two years from the date of the conversion. If, under the facts in Sommerville, there was no waiver, it is erroneous to apply the doctrine where all the plaintiff did was rely upon the good faith and honesty of its debtors.

The majority also seeks to distinguish Security State Bank v. Clovis Mill & Elevator Co., 1937, 41 N.M. 341, 68 P.2d 918, on the stated basis that consent and waiver were not involved in that case. Admittedly, in Clovis Mill, this court did not, in so many words, mention waiver. There, proof was offered as to a custom upon which purchasers of grain claimed to rely as a defense to an action for conversion. In that case, of course, the Clovis Mill was a purchaser rather than an auctioneer as we have here; but if a purchaser cannot, under our decisions, rely on a custom conflicting with a contract, certainly the defendant here, as an auctioneer and standing in the shoes of the debtor, should not be placed in a superior position. See also Higgins v. Cauhape, 1927, 33 N.M. 11, 261 P. 813.

A casual reading of the opinion in Security State Bank v. Clovis Mill & Elevator Co., supra, would make it appear that it is not analogous to the instant proceeding, because, as stated by the majority, the opinion, discussing the custom, states: " * * * for purchasers * * * to rely upon evidence furnished them by *mortgagors* as to the existence of mortgages * * *." However, in examining the original file in the Supreme Court (No. 4172), it is obvious that an error was made in the preparation of the opinion and the word "mortgagors" should have been "mortgagees." As a matter of fact, the appellant's brief in that case stated as its Point Four the following:

"THE COURT ERRED IN HOLDING THAT APPELLANT HAD CONSTRUCTIVE NOTICE OF APPELLEE'S CHATTEL MORTGAGE, REGARDLESS OF THE FACT THAT APPELLEE FAILED TO NOTIFY APPELLANT THEREOF ACCORDING TO THE CUSTOM AND USAGE OF THE LOCALITY."

The "appellee" referred to in the above point was the bank (the mortgagee), not the "mortgagor," who was not a party to the lawsuit. It must be assumed that the court in writing the opinion made a mistake as to the description of the individual concerned, as there was neither testimony nor point relied upon for reversal as to the mortgagor's furnishing anything. The testimony was all to the effect that banks and lending agencies furnished lists to the elevator, and that it was from this list, or lack thereof, that the elevator was guided in making payments for grain. In the above context, therefore, the Security State Bank case is directly in point here and is authority against the position taken by the majority. It is unfortunate that the error in typing and printing occurred; nevertheless, the statement by the court in that case, that custom cannot prevail against the terms of a contract in conflict with it, is the law in this state and is contrary to First National Bank & Trust Co. of Oklahoma City, Okl. v. Stock Yards Loan Co., supra, the principal authority relied upon by the majority. See Higgins v. Cauhape, supra.

SWASTIKA K CATTLE:

I disagree with the majority's disposition as to these cattle. The trial court's finding No. 6 was to the effect that the plaintiff consented to the sales of these cattle and "did consent to the remitting of any proceeds to Bill Bunch, Jr." This finding simply is not supported by any evidence in the record. Insofar as the claimed consent to the sales, it can only be found by inference added on inference, and there is literally nothing in the record justifying the trial court's finding that the *plaintiff consented* to the remitting of the proceeds to Bunch, Jr. For this reason alone, I am of the opinion that the judgment of the trial court with respect to these cattle was incorrect and must be reversed.

I am also of the opinion that the trial court erred in excluding the stipulation referred to in the majority opinion, and, though it might have made no difference in the judgment of the trial court, I feel it was an abuse of discretion to refuse the tender.

## APPLICABILITY OF THE COMMERCIAL CODE:

The most serious and, in my view, far-reaching effect of the majority opinion is the statement above referred to, that the Uniform Commercial Code does not displace the law of waiver, or waiver by implied acquiescence or consent. The majority relies basically upon § 50A–1–103, N.M.S.A.1953, without taking any note of other provisions of the Code which I deem controlling. The only other sections of the Code even noticed by the majority are §§ 50A–9–306 and 50A–9–307, N.M.S.A.1953, which have no bearing whatsoever on the facts of this lawsuit, inasmuch as they are concerned only with rules of priority. See 2 Gilmore, Security Interests in Personal Property 714 (1965).

Of particular importance here is § 50A–1–205(4), N.M.S.A.1953, which reads as follows:

"(4) The express terms of an agreement and an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other; but when such construction is unreasonable express terms control both course of dealing and usage of trade and course of dealing controls usage of trade."

The security agreement specifically provided that the property could not be sold without the prior *written consent of the plaintiff*. Admittedly, there was no written waiver, as is contemplated under § 50A–1–107, N.M.S.A.1953, and the only way in which the trial court and the majority have been able to arrive at a waiver is the finding that, by common practice, usage and procedure, Bunch was allowed to sell the cattle covered by the security agreement. Obviously, such a finding and such a conclusion by my brethren is contrary to § 50A–1–205(4), N.M.S.A.1953, supra, as well as Security State Bank v. Clovis Mill & Elevator Co., supra. The trial court referred to "common practice, usage and procedure," which is really not very different from the terms of the statute in its reference to "course of dealing or usage of trade." To all intents and purposes, they are the same, and the statute required the trial court to give effect to the express terms of the security agreement as controlling over course of dealing and usage of trade.

Prior to the acts of conversion (the sales), there was no default, and there is no competent evidence showing that prior to default plaintiff waived any right. There being no waiver of any right before its vio-

lation, the violation of the right to written consent is the only possible subject for waiver. Without knowledge of a violation there could be no waiver. The contrary conclusion by the majority ignores the determinative statutes as well as case authority. In addition, the plaintiff's right to take possession under § 50A–9–503, N.M.S.A. 1953, in case of default could not have been waived *before the default,* because until that time it was not available. This is plaintiff's only effective remedy and it is completely nullified by the majority opinion.

It should be kept in mind at all times that the defendant auctioneer was the agent of the debtor Bunch. He is in no better position here than was the debtor himself. See Producers Livestock Loan Co. v. Idaho Livestock Auction (9th Cir. 1956), 230 F.2d 892; Birmingham v. Rice Bros., 1947, 238 Iowa 410, 26 N.W.2d 39, 2 A.L.R.2d 1108; First National Bank of Pipestone v. Siman (1937), 65 S.D. 514, 275 N.W. 347; and Bunn v. Walch, 1959, 54 Wash.2d 457, 342 P.2d 211. Thus, here, the defendant had no more right than the debtor himself to rely on a custom and usage which was contrary to the express terms of the contract.

The Commercial Code also has a decided bearing upon the Swastika K disposition. The trial court, by refusing to admit the tendered evidence of ownership, never arrived at a decision as to whether these particular cattle were "similar collateral acquired" under the provisions of § 50A–9–204(3), N.M.S.A.1953, in that they may have been covered by the original security agreement and were possibly after-acquired property and not proceeds subject to rules for perfection of proceeds.

Broadly speaking, the majority seems to have carved out an exception to the application of the Commercial Code of security interests in farm products. In so doing, the general purposes of the Commercial Code, §§ 50A–1–102, 50A–1–106, as well as many other provisions of Ch. 50A, N.M. S.A.1953, are placed in jeopardy and "the door is opened" for judicial construction of the Code in a manner not contemplated by the authors or the legislature.

For the above reasons, I respectfully dissent.