UNITED STATES of America,
Plaintiff,

v.

E. W. SAVAGE & SON, INC., Defendant
and Third-Party Plaintiff,

v.

Robert W. SHIELDS, Third-Party
Defendant.

UNITED STATES of America,
Plaintiff,

v.

ADAMS DOUGHERTY LIVESTOCK
COMMISSION COMPANY, Defendant
and Third-Party Plaintiff,

v.

Robert W. SHIELDS, Third-Party
Defendant.

UNITED STATES of America,
Plaintiff,

v.

OLSEN–FRANKMAN COMMISSION
COMPANY, Defendant and Third-
Party Plaintiff,

v.

Robert W. SHIELDS, Third-Party
Defendant.

Civ. Nos. 71–35S, 71–36S and 71–38S.

United States District Court,
D. South Dakota, S. D.

May 26, 1972.

David R. Gienapp and Robert D. Hiaring, Asst. U. S. Attys., for plaintiff.

Claude A. Hamilton and David V. Vrooman, Sioux Falls, S. D., for defendants and third party plaintiffs.

Gale E. Fisher, of May, Johnson & Burke, Sioux Falls, S. D., for third party defendant.

## MEMORANDUM DECISION

NICHOL, Chief Judge.

Upon the completion of the evidence all parties to this action moved for a directed verdict. The Court granted the plaintiff's motion against the three principal defendants, who are the livestock commission agents, and the three principal defendants' motions against the third party defendant, Shields. Because of the importance of this decision and the recent admonition by the Eighth Circuit Court of Appeals not to grant directed verdicts unless exceptional circumstances exist, Passwaters v. General Motors Corp., 454 F.2d 1270, 1272–1273 (8th Cir. 1972), the Court is filing this memorandum decision.

Robert W. Shields borrowed $26,000 from the Farmers Home Administration (F.H.A.). As evidence of this debt he executed a promissory note and a security agreement on May 6, 1968. The security agreement listed 127 head of mixed cattle including the proceeds and products thereof as security. (See Gov't. Ex. # 1) A similar security agreement covering the same loan was executed on August 6, 1968. (Gov't. Ex. # 6) A financing statement covering the August 6, 1968, security agreement was properly filed.

The debtor, Shields, without authorization, sold 12 head of the mortgaged cattle at the Canton Livestock Sales Co. on August 8, 1968. The check for the cattle was made payable to Shields and the F.H.A. This sale was accepted and approved by the F.H.A. district supervisor on August 12, 1968. (Gov't. Ex. # 41)

Shields then made the following unauthorized sales to:

#### Defendant E. W. Savage & Son, Inc.

| Ex. # | Date | Head | Amount |
|---|---|---|---|
| 7 | October 30, 1968 | 5 | $1,015.82 |
| 8 | January 8, 1968 | 11 | $2,175.57 |
| 9 | March 4, 1969 | 18 | $ 644.50 |
| | | Total | $3,835.89 |

#### Defendant Olsen-Frankman

| 17 | January 14, 1969 | 10 | $2,245.52 |
|---|---|---|---|
| 16 | January 16, 1969 | 17 | $3,119.33 |
| 15 | January 20, 1969 | 11 | $2,133.86 |
| 14 | January 21, 1969 | 1 | $ 136.05 |
| 13 | February 13, 1969 | 9 | $1,863.24 |
| | | Total | $9,498.00 |

#### Defendant Adams-Dougherty Livestock Comm.

| 10 | January 7, 1969 | 14 | $2,992.12 |
|---|---|---|---|
| 11 | September 23, 1968 | 4 | $ 577.04 |
| 12 | August 27, 1968 | 3 | $ 614.43 |
| 18 | December 19, 1968 | 16 | $3,703.39 |
| | | Total | $7,886.98 |

These defendants paid the proceeds of these sales to Shields, who failed to use the money for repayment of his F.H.A. loan.

The United States now seeks to recover the amount of its loss from the livestock commission merchants, defendants Adams Dougherty, Olsen-Frankman and E. W. Savage & Son. The government's theory is that these defendants were the agents of the third party defendant, Shields, and that they aided Shields in converting the cattle covered by the security agreement.

■ The Circuit Courts of Appeals are split over the issue of whether state or federal law controls in suits by the United States to enforce its rights under F.H.A. mortgages.[1] See United States v. Hext, 444 F.2d 804, 807–809 (5th Cir. 1971). The Eighth Circuit Court of Appeals has held that state law applies. United States v. Kramel, 234 F.2d 577 (8th Cir. 1956). Since the loan and the conversion occurred in South Dakota, her law applies.

■ In South Dakota the defendant livestock commission merchants are agents of the debtor, Shields, and are personally liable for assisting their principal, Shields, in converting the property of the F.H.A. by selling the mortgaged cattle. First National Bank of Pipestone v. Siman, 65 S.D. 514, 275 N.W. 347 (1937); S.D.C.L. Sec. 59–5–2(3) (1967). The agents can be relieved of this liability by showing an acquiescence or consent to the sale on the part of the true owner or mortgagee. Rapid City Production Credit Ass'n v. Transamerica Ins. Co., S. D., 184 N.W.2d 49, 50 (1971).

Defendants urge that they should be allowed to show by prior course of dealing and trade usage that the F.H.A. as a secured party authorized the debtor, Shields, to sell the secured property, farm products, under S.D.C.L. Sec. 57–37–19 (1967) (U.C.C. 9–306). That section provides:

> (A) security interest continues in collateral notwithstanding sale, exchange or other disposition thereof by the debtor unless his action was authorized by the secured party in the security agreement *or otherwise.* . . . (emphasis added)

The security agreement provides that the debtor will not "sell or otherwise dispose of it (the collateral) or of any interests therein, or permit others to do so, without prior written consent of Se-

---

1. This question is really somewhat academic in view of the fact that most of the states, as has South Dakota, have adopted the Uniform Commercial Code. Thus as United States v. Hext, 444 F.2d 804, 809–811 (5th Cir. 1971) points out, any federal rule would be patterned after the Uniform Commercial Code to acquire uniformity. Thus the same result as we reach by applying state law would be reached by applying a federal standard.

cured Party. . . ." (Gov't. Ex. # 6 par. III(B) (6)). It also provides that the debtor will "comply with such farm and home management plans as may be agreed upon from time to time by Debtor and Secured Party . . . ." (Gov't. Ex. # 6 par. III(B) (2)). The Farm and Home Plan provides that the debtor was to purchase in June,

> 150 light calves to be run on pasture and fed silage on hand.

> 3. Carry cattle this fall on primarily silage and hay ration and on full feed of corn for 90 day(s) prior to selling. (Gov't. Ex. # 2 Sec. D.)

The security agreement also provides that the security interest covers proceeds and products of the collateral. (Gov't. Ex. # 6 par. II.)

■ S.D.C.L. Sec. 57–1–18 (1967) (U.C.C. 1–205(4)) provides:

> The express terms of an agreement and an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other; *but when such construction is unreasonable express terms control* both course of dealing and usage of trade and course of dealing controls usage of trade. (emphasis added).

The principle defendants contend that under Uniform Commercial Code Sec. 9–306, Comment 3, the circumstances of the parties, the nature of the collateral, the course of dealing of the parties and the usage of trade are admissible to show that a sale was impliedly authorized by the inclusion of proceeds as collateral.[2] In addition they contend that this evidence would resolve the inconsistency between the security agreement requiring a written authorization to sell and the farm plan authorizing sale 90 days after putting the cattle on corn which they claim would be about the time the sales were made. If there

is an inconsistency, S.D.C.L. Sec. 57–1–18 (1967) (U.C.C. Sec. 1–205(4)) requires that the writing control and, therefore, no evidence of trade usage or course of dealings is admissible. See the dissent in Clovis National Bank v. Thomas, 77 N.M. 554, 566, 425 P.2d 726, 734 (1967).

■ The testimony at trial did not show any written or oral authorization to sell. If the farm plan could be construed as an authorization to sell, still no sale was authorized by it prior to March 21, 1969, which would be 90 days after the fall of 1968. United States v. Hansen, 311 F.2d 477 (8th Cir. 1963) is not applicable since that decision turned on the fact that the county supervisor had expressly consented to the sale, as he was authorized by regulation to do.

■■ Defendants' remaining theory is that the government consented to the sale by acquiescence. This theory is similar to a theory of estoppel. The United States cannot be estopped by the act of its agent even if grounds normally sufficient for estoppel in a suit between private parties are present. United States v. Ulvedal, 372 F.2d 31 (8th Cir. 1967). Thus, absent an express consent, the United States cannot be said to have acquiesced to the sale.

Defendants relied heavily on Clovis National Bank v. Thomas, 77 N.M. 554, 425 P.2d 726 (1967), in support of their contention that there was sufficient evidence of consent by acquiescence to present a jury question. The *Clovis* case is distinguishable in that in it the secured party was a private party and not the United States.

■ If the Clovis case were controlling still there would not be sufficient evidence to create a jury question. The following table shows the facts presenting a jury question in *Clovis* which either were not present in this case or are distinguishable.

---

2. United States v. Big Z Warehouse, 311 F.Supp. 283, 287 (S.D.Ga.1970), held that the inclusion of proceeds as collateral was not a waiver of the requirement of a written authorization to sell.

| CLOVIS | PRESENT CASE |
|---|---|
| 1. Debtor had made 2 prior unauthorized sales which the mortgagee approved by accepting the proceeds 3½ months and 6½ months after giving the cattle as security. | Debtor made one unauthorized sale 2 days after giving the cattle as security which the mortgagee (FHA) approved by accepting the proceeds. |
| 2. No instructions were given to the debtor to include the mortgagee's name as payee on any sale of the secured property. | Mortgagee, at the signing of the security agreement, instructed debtor to include mortgagee's name as payee on any check from the sale of any secured property. This procedure was followed on the first unauthorized sale made by the debtor. |
| 3. The mortgagee admitted it was aware that the debtor was making unauthorized sales. | Mortgagee denies that it knew debtor made any unauthorized sales other than the one specifically approved. |
| 4. An investigation of the debtor's financial ability and transactions was conducted after several unauthorized sales had been made and then an additional loan and similar security agreement were executed between debtor and mortgagee. | No investigation was made by mortgagee during the period of the loan since there was no indication of unauthorized sales. |
| 5. Facts do not indicate whether or not proceeds were covered in the security agreement. | Proceeds were covered in the security agreement. |
| 6. Mortgagee testified that it was their custom and practice to permit a debtor to retain possession and sell the collateral (cattle) without obtaining prior written consent. | Mortgagee testified that a sale of the collateral by the debtor without prior consent was unusual and that the debtor was instructed to include the mortgagee's name as payee on the check from the sale of any collateral. |
| 7. Mortgagee never demanded that the debtor obtain prior written consent before selling collateral even though mortgagee knew debtor was making unauthorized sales. | Mortgagee told debtor consent for sale was necessary and to include mortgagee's name as payee on check from sale of collateral. |
| 8. Mortgagee testified that debtors never contact mortgagee to secure permission to make sales and that mortgagee relies on the honesty of the debtor. This is true 99% of the time. | No such testimony here. |

It cannot be said that upon a fair reading of the evidence in this trial that there is an issue as to acquiescence upon which reasonable minds can differ.

Defendants' second theory was that the secondary mortgage on the debtor's real estate given to the F.H.A. on February 10, 1969, was an accord and satisfaction. Thus the contention is that the real estate mortgage was substituted for the security agreement and, therefore, the United States had no loss from the conversion.

The debtor, Shields, testified that it was his desire that the secondary mortgage on his real estate cover all losses that the F.H.A. may have incurred through loans to him. There was no evidence that either party understood or intended the second mortgage to be substitute security for the security agreement. That mortgage expressly provided that "the proceeds of foreclosure sale . . . shall be applied . . . to the payment of . . . any other indebtedness of Borrower owing to or insured by the Government." (Defendant Ex. B, par. 14). This language indicates that the secondary mortgage was additional security and not substitute security.

Defendants rely on Drovers' Cattle Loan & Investment Co. v. Rice, 10 F.2d 510 (N.D.Iowa 1926), which held that the agent of the convertor is released if the mortgagee accepts substitute security after learning of the conversion. In *Drovers'* the evidence was controverted as to whether or not the deeds taken as security after the conversion were substituted security. Here the evidence is uncontroverted that the secondary real estate mortgage was additional security and not substituted security.

After carefully considering all of the contentions of the parties, the Court can find no issue of fact to submit to the jury and finds that as a matter of law the United States is entitled to a directed verdict against the defendants, E. W. Savage & Son, Inc., Olsen-Frankman and Adams-Dougherty Livestock Commission, and that the defend-

128

ants, E. W. Savage & Son, Inc., Olsen-Frankman and Adams-Dougherty Livestock Commission are entitled to a directed verdict against the third party defendant Shields.